Argued and submitted February 29, affirmed May 24, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## DEBRA SAMPSON,
*Appellant.*

## (96CR2748MI; CA A101071)

6 P3d 543

Andrew S. Chilton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

Defendant appeals from her conviction for driving under the influence of controlled substances (DUII-CS). ORS 813.010(1)(b).[1] She assigns error to the trial court's denial of her motion *in limine* to suppress evidence of a 12-step Drug Recognition Expert (DRE) protocol. We affirm.

### HISTORY OF THE CASE

Defendant was stopped on I-5 after Officer Kratz observed her enter the on-ramp without using her turn signal, speed down the freeway, and make a sudden swerve over the white fog line in her lane of traffic. After noting that there was no smell of alcohol about defendant, Kratz asked her to take a series of field sobriety tests (FSTs). Defendant agreed and, according to the officer, performed poorly.

After the conclusion of the FSTs, Kratz arrested defendant for DUII-CS. Defendant consented to a search of her car that revealed a prescription bottle containing less than one ounce of marijuana. Kratz took defendant to the police station, where he performed an Intoxilyzer screen. The test showed a blood alcohol content of 0.0 percent.

Kratz then requested an officer to perform a DRE examination on defendant. The DRE protocol, which is described in detail below, is a 12-step procedure performed by a trained officer that purports to determine whether a subject is under the influence of a controlled substance. On defendant's arrival at the station, an officer explained the DRE protocol and informed her that she was not required to take the tests. Defendant agreed to perform the tests and again performed poorly. The DRE officer asked defendant for a urine sample to corroborate his opinion that she was under the influence of a controlled substance. Defendant agreed to provide a sample. The record does not reveal the result of the urinalysis.

---

[1] ORS 813.010(1)(b) provides, in part:

"A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"* * * * *

"(b) Is under the influence of * * * a controlled substance * * *[.]"

Defendant was charged with DUII-CS. The state filed a pretrial motion[2] to qualify the DRE officers as experts and to obtain a ruling on the admissibility of DRE evidence. Specifically, the state argued that expert testimony about the DRE protocol is nonscientific and is helpful to the trier of fact. In the alternative, the state argued that, if the DRE protocol *is* scientific evidence, it is reliable and admissible under *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). Defendant responded that DRE evidence is not scientific, although the state sought to give the protocol a "facade of scientific legitimacy," but that it must be analyzed as though it were scientific evidence. Under that analysis, DRE evidence is inadmissible.

The trial court ruled that, under *Brown* and *O'Key*, DRE testimony is scientific evidence and is admissible. The court noted that the protocol involves an integrated, multi-step procedure that is systematized and standardized and is conducted by officers trained to observe behavioral symptoms of drug impairment. The court concluded that the probative value of the evidence outweighed the danger of unfair prejudice. OEC 403. However, the court barred the state from referring to the DRE officer as an expert, reasoning that to do so "would be a comment on the evidence and would lend undue weight to one person's testimony and credibility."[3] The trial court then denied defendant's motion to suppress the results of the DRE evaluation in her case. Defendant was convicted after a stipulated facts trial.

Defendant appeals, assigning error to the trial court's denial of her motion to suppress DRE evidence. She argues that the DRE protocol is inadmissible as scientific evidence, because it has not achieved sufficient acceptance in the relevant scientific community and because the paucity of peer reviewed studies testing the protocol handicap an informed determination of whether the protocol has sufficient scientific validity to be admitted. The state responds that the full DRE protocol need not meet the standards for

---

[2] The motion also consolidated defendant's case with four others for the purpose of the evidentiary hearing.

[3] The state does not cross-assign error to that ruling. Accordingly, we do not consider it further.

admission of scientific evidence but that, at any rate, the protocol satisfies those standards. We emphasize that defendant does not challenge the weighing of individual steps of the protocol in this case but, rather, presents only the question of whether the DRE protocol is, *in general*, admissible. With that in mind, we conclude, as did the trial court, that DRE testimony is scientific evidence and is admissible.

## DRE PROTOCOL

In the 1970s, the Los Angeles Police Department, in conjunction with the Southern California Research Institute, began developing field tests to detect drivers impaired by controlled substances. They combined FSTs with police drug training, medical information about the physiological and behavioral effects of controlled substances, and law enforcement information about police interaction with impaired drivers to create the DRE protocol, a 12-step procedure by which officers could detect the probable source of a driver's impairment. In the 1980s, the National Highway Traffic Safety Administration (NHTSA) conducted a study of the program, and the International Association of Chiefs of Police assumed responsibility for training and certifying DRE officers. Thirty-three states currently have formal DRE programs. Officers from several foreign countries have also gone through the training.

The DRE protocol has three major functions. First, it attempts to determine the existence of impairment in a driver and to determine whether that impairment is caused by alcohol or drugs. Second, it asks whether the cause of the impairment is something other than alcohol or drugs, such as a medical condition. Third, if the impairment is caused by drugs, the DRE protocol purports to identify which drug, among seven broad categories,[4] covered the impairment.

A trained DRE officer conducts the protocol, at the police station, after the arrest. According to the NHTSA's DRE training materials, the protocol consists of the following 12 steps:

---

[1] Those categories are: central nervous system depressants, inhalants, phenocyclidine (PCP), marijuana, cocaine/amphetamines, hallucinogens, and heroin.

1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

3. The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN),[5] vertical gaze nystagmus (VGN),[6] and lack of convergence (LOC).[7]

5. The DRE officer conducts four FSTs: the Romberg balance test,[8] the walk and turn test, the one leg stand test, and the finger to nose test.

6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

---

[5] Nystagmus is

"a physiological phenomenon, which has been defined as 'an involuntary rapid movement of the eyeball.' HGN 'is an involuntary, rapid oscillation of the eyes which occurs when a person looks to the side at an object, and is characterized by an involuntary pendular (back and forth) jerking movement of the eye.' Stated differently, HGN is '[a]n inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or boun[c]ing)." *O'Key*, 321 Or at 294 (citations omitted).

[6] VGN is an "up-and-down jerking of the eyeball that occurs as the eyes are elevated." NHTSA, "Drug Evaluation and Classification Training Student Manual," at "Glossary."

[7] A subject's eyes possess convergence if they are able to track and focus one stimulus as it is moved quickly toward the bridge of the nose. If the eyes do not track the stimulus evenly or do not focus on it, the subject lacks convergence. *Id.*

[8] In the Romberg balance test, the officer assesses the subject's balance while the subject silently estimates a 30-second time period. *Id.* at IV-13.

9. The DRE officer inspects for injection sites.

10. The DRE officer conducts a focused interrogation and observation of the subject's behavior.

11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer.

NHTSA, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993).

To qualify as a DRE officer, an officer must have experience in traffic enforcement. The first part of DRE training is a 16-hour preschool that teaches the officer to recognize the effects of drugs on the eyes, take vital signs, and administer FSTs. That is followed by a 56-hour training course, covering the 12 steps of the protocol, the eye exams used in steps 3 and 7, taking vital signs, recognizing the symptoms of various drugs, performing parts of the protocol on volunteer drinkers, interpreting the DRE form, instruction on recognizing multiple drug use, and role-playing. Candidates are tested on all material. To obtain certification, the officer must conduct 12 DRE evaluations (involving at least three drug categories) and obtain nine toxicology screens; there must be a 75 percent corroboration rate between the toxicology result and the DRE candidate's opinion. The DRE candidate's opinion is considered correct if it identifies one drug in the subject's system correctly and not more than one drug incorrectly. The candidate must also pass an exam that tests the ability to recognize multiple drug use. The IACP must give final approval for certification, which is valid for two years and requires ongoing training.

## IS DRE TESTIMONY SCIENTIFIC EVIDENCE?

██ We review the question of whether evidence is "scientific," and if so, whether it is admissible, for errors of law. *See, e.g., O'Key*, 321 Or at 289-322. We review the preliminary factual issues underlying the admissibility of scientific evidence *de novo. Id.* at 320 n 45.

■ To be considered scientific, evidence must "draw[ ] its convincing force from some principle of science * * *." *Brown*, 297 Or at 407. In determining whether evidence is scientific, we also determine whether it "possesses significantly increased potential to influence the trier of fact as [a] 'scientific' assertion[ ] * * * [especially] where the proffered expert scientific testimony is innovative, nontraditional, unconventional, controversial, or close to the frontier of understanding." *O'Key*, 321 Or at 293.

■ Considering the DRE protocol as a whole, we conclude that it *is* scientific evidence subject to the judicial gatekeeping function. First, it is clear that DRE draws its authority from scientific principles. *Brown*, 297 Or at 407. The HGN test's scientific nature is well established. *O'Key*, 321 Or at 296. Other steps of the protocol also employ a wide variety of procedures—the BAC analysis, the VGN test, the LOC test, the vital signs exam, and the toxicological analysis—each of which is based on medical science. Each of those steps produces a test result that compares with results established through scientific research that purport to show the subject to be more or less likely under the influence of a controlled substance. The portions of the test that are not clearly based on medical science—parts of the physical examination, such as the check for needle marks, the DRE interview of the arresting officer and the "focused interrogation" of the subject—provide the DRE officer with important information. However, the DRE officer's final analysis is heavily informed by data derived from the scientific portions of the protocol. In fact, according to the IACP standards controlling the protocol, the last step, the toxicological test, must confirm the presence of at least one controlled substance or else the entire protocol results are considered invalid.

■ In determining whether evidence is scientific, we also consider whether its scientific assertions have the potential to exert a significantly greater influence on the factfinder than nonscientific evidence. *Id.* at 293. DRE testimony, with its highly specialized certification procedure, battery of medicalized tests, and complicated end-stage analysis, does carry that potential. The protocol was developed in conjunction with scientists. The IACP's briefing manual on the protocol

refers to it as "a series of clinical and psychophysical examinations." It relies, for its legitimacy, on a cluster of published field and laboratory studies whose scientific patina naturally would have a tendency to influence lay persons. Although the protocol is a mosaic of scientific and observational techniques, their blending means that a juror's perception of the validity of each component will likely be enhanced by the scientific imprimatur of the whole. We conclude that, to the extent a DRE protocol is convincing on the issue of whether a defendant was under the influence of a controlled substance, that persuasive force emanates predominantly from the substance *and* the aura of the scientific principles on which its methodology is based. Consequently, we hold that DRE testimony is scientific evidence.

As a postscript to our discussion of the issue, we note that five other courts have considered the issue of the scientific nature of DRE evidence; three have concluded that it is not scientific evidence. In *State v. Klawitter*, 518 NW2d 577 (Minn 1994) the Minnesota Supreme Court concluded that the protocol "is not itself a scientific technique but rather a list of the things a prudent, trained and experienced officer should consider before formulating or expressing an opinion whether the subject is under the influence of some controlled substance." *Id.* at 584. The court noted that the HGN and VGN portions of the test were admissible under *Frye v. United States*, 293 F 1013 (DC Cir 1923), but focused on the fact that the protocol, taken as a whole, works not "to qualify police officers as scientists but to train officers as observers." *Klawitter,* 518 NW2d at 585.

In *U.S. v. Everett*, 972 F Supp 1313 (D Nev 1997), the federal district court also concluded that the evidence was not scientific, after considering "whether the proposed testimony * * * [is] on a scientific subject." *Id.* at 1318-19 (emphasis omitted). Like the court in *Klawitter*, the *Everett* court concluded that the DRE protocol is based on scientific principles but that the protocol as a whole is "primarily the observable application of [drug] classification differences." *Id.* at 1321. It concluded that DRE evidence is "opinion" testimony. *Id.* at 1326.

In *Williams v. State*, 710 So 2d 24 (Fla App 3 Dist), *rev den* 725 So 2d 1111 (Fla 1998), the Florida appellate court concluded that the "general portion" of the DRE protocol does not constitute scientific evidence, because "the tests, signs and symptoms of the protocol are within the common understanding of the average layman." *Id.* at 28. The court noted further that, although the HGN, VGN, and LOC tests are scientific, they are not subject to greater scrutiny than nonscientific evidence, because those tests do not employ "new or novel" scientific techniques. *Id.* at 29. The court upheld admission of the evidence. *Id.* at 37.

Two other courts have concluded that the DRE protocol *is* scientific evidence subject to the court's gatekeeping function and both admitted the evidence. In the first of these cases, *People v. Quinn*, 153 Misc 2d 139, 580 NYS2d 818 (Dist Ct 1991), *rev'd on other grounds* 158 Misc 2d 1015, 607 NYS2d 534 (App Term 1993), the court assumed, without further analysis, that the DRE protocol was scientific. *Id.* at 151. It found the DRE protocol helpful to the officer in "reliably and accurately determin[ing] whether an individual is impaired, and if so, by what classification of drug." *Id.*

More recently, the Washington Supreme Court held that the DRE protocol is scientific evidence, admissible (subject to limitations) once the DRE officer is shown to be qualified to give expert testimony. *State v. Baity*, 140 Wash 2d 1, 991 P2d 1151 (2000). Specifically, the court noted that only the nystagmus portion of the protocol is, standing alone, scientific in nature. *Id.* at 11, 991 P2d at 1157. Nevertheless, it reasoned that it "must analyze whether the DRE protocol, *as a whole*, comports" with the rules for admission of scientific evidence. *Id.* at 14, 991 P2d at 1159 (emphasis added). The court then analyzed the conclusions of the *Klawitter* and *Williams* decisions, noting that in those cases the courts bifurcated the "scientific" HGN, VGN, and LOC tests from the rest of the protocol. *Id.* at 15-16, 991 P2d at 1159-60. It concluded, without further explanation, that, provided all steps of the protocol were undertaken, the DRE protocol was scientific evidence and admissible. *Id.* at 17, 991 P2d at 1160.

Distinguishing features in Oregon's methodology for determining whether a protocol is scientific dilute the persuasive influence of these decisions. *Klawitter* and *Everett*,

for example, base their results on the observational nature and simplicity of the protocol. However, Oregon law also focuses on the overall effect that a technique's aura of scientific certainty will have *on the jury*. *O'Key*, 321 Or at 293. For reasons already noted, that aura will tend to enhance the validity of the protocol as a whole in the eyes of the trier of fact. Although *Williams* based its conclusion on the proposition that lay jurors could easily understand the general portion of the protocol, its analysis of the nystagmus and line of convergence tests rested on *Frye*'s "new or novel" trigger for its admissibility test, a factor that is not compelling in Oregon following *O'Key*.[9] Finally, although we share their conclusion, the *Quinn* and *Baity* courts did not provide detailed explanations of their reasoning.

## PURPOSE OF DRE TESTIMONY

■■ Before applying the test for admissibility of scientific evidence, we must determine for what purpose the evidence is offered. *O'Key*, 321 Or at 307. The state offered DRE testimony as tending circumstantially to make more probable a fact of consequence—that defendant was under the influence of a controlled substance. That fact of consequence is an essential element of DUII-CS that the state must prove beyond a reasonable doubt. ORS 813.010(1)(b). We consider the admissibility of DRE evidence only for that purpose.

## STANDARD FOR ADMISSION OF SCIENTIFIC EVIDENCE

Before 1995, the test for admitting scientific evidence in the Oregon courts required a seven-step analysis of the testimony's relevance and helpfulness. *Brown*, 297 Or at 408-09. That standard changed as a result of the United States Supreme Court's decision in *Daubert*, which focused on the validity of the scientific methodology underlying the proffered evidence. Following that decision, the Oregon Supreme Court adapted the *Brown* standard to incorporate *Daubert*, according several factors of the federal decision "persuasive" weight in Oregon law. *O'Key*, 321 Or at 306.

---

[9] In the Oregon courts, *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993), has superseded *Frye* as persuasive authority with respect to the admissibility of scientific evidence. *O'Key*, 321 Or at 306-07.

■ The *Brown* and pertinent *Daubert* factors overlap to some degree and boil down to a seven-step test, subject to the caveat that these factors are not an exclusive list of considerations to be applied mechanically. *Id.* at 300. The factors are:

"(1) The technique's general acceptance in the field;[10]

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;[11]

"(5) The existence of specialized literature;[12]

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert." *Id.* at 299.

Should we conclude that DRE evidence passes muster under the *Brown / O' Key* analysis, we must then evaluate whether the probative value of the evidence is substantially outweighed by the possibility of unfair prejudice. OEC 403.

### APPLICATION OF STANDARD TO DRE TESTIMONY

*General acceptance*

■ ■ In evaluating the level of acceptance that the DRE protocol has attained, we must first determine who constitutes the relevant scientific community. *O'Key*, 321 Or at 304 (citing *Daubert*, 510 US at 594). The trial court defined the relevant community as "law enforcement, the community that studies alcohol and drug effects on human behavior and the community of pharmacology." The state does not dispute that assessment. Defendant, however, takes issue with it, arguing first that the trial court defined the community "so narrowly as to exclude DRE's potential critics." Defendant

---

[10] This factor overlaps with a pertinent *Daubert* factor, the "degree of acceptance in the relevant scientific community." *Id.* at 304 (citing *Daubert*, 509 US at 594).

[11] This factor overlaps with *Daubert*'s "rate of error" and "existence of operational standards controlling the technique's application" factors. *Id.* at 304.

[12] This factor overlaps with *Daubert*'s consideration of whether the theory or technique can be tested, as well as the subject to peer review and publication factor.

notes that the state's witnesses testified that the DRE protocol is drawn from consultation with physicians, toxicologists, vision specialists, psychopharmacologists, and behavioral psychologists, among other experts, and argues that the relevant scientific community consequently must include those fields. The state responds that, although the protocol integrates information from a wide variety of fields, taken as a whole, it does not belong to any of those fields besides the ones that developed it.

We agree with the state that it is not necessary to elicit expert testimony from every field relating, however tangentially, to the DRE protocol. Testimony from experts in the fields that have developed and studied the protocol is sufficient. *Accord O'Key*, 321 Or at 316. Nevertheless, we agree with defendant that the relevant scientific community is somewhat broader than the trial court believed it to be. That community is not limited to the fields that developed the protocol; it also includes other disciplines that have given its study serious consideration. *Id.* (With respect to the HGN test, "the scientific disciplines of pharmacology, ophthalmology, and to a lesser extent optometry should be included with behavioral psychology, highway safety, neurology, and criminalistics in the relevant scientific community. Each of those disciplines has been involved *in the study* of alcohol-induced nystagmus.") In addition to drug and alcohol researchers and pharmacologists, the fields which have contributed the most to the development of the protocol, we conclude that the relevant scientific community includes physicians, toxicologists, and vision experts, each of whose fields have studied the protocol extensively.

We cannot agree with the trial court, however, that "law enforcement" *in general* constitutes a "scientific community." Police officers are normally competent to testify concerning matters within the province of their own training and experience, including observational techniques that are part and parcel of the DRE protocol; they may not, however, validate its underlying scientific basis. *Accord People v. Kelly,* 17 Cal 3d 24, 39, 549 P2d 1240, 130 Cal Rptr 144 (1976) (prospective police witness not competent to testify with respect to validity of voiceprint analysis, because his "qualifications are those of a technician and law enforcement officer, not a

scientist," and he thus was not qualified to express an informed opinion on the views of the scientific community).

■ Defendant disputes the trial court's conclusion that the DRE protocol has achieved general acceptance within the relevant scientific community as we have defined it. Specifically, she emphasizes testimony by two defense witnesses, Drs. Burton and Bovee. Burton, a physician and toxicologist, testified that the DRE protocol was not generally accepted by the toxicology community. Bovee, a physician who specializes in treating addiction, testified that he, personally, would not make a diagnosis or conclusion based on the DRE protocol.

The state, on the other hand, presented testimony by Dr. Richard Smith, a physician who teaches the protocol and considers it valid "for law enforcement use." Dr. Citek, a doctor of optometry with a Ph.D. in vision science, testified that his scientific community considers the protocol reliable and valid. Finally, Dr. Burns, a Ph.D. drug and alcohol researcher who has testified extensively for the prosecution in DRE admissibility cases,[13] stated that the protocol is "accepted by * * * those people who understand what the program is and are in a position to evaluate it." We agree with the trial court that Burns's testimony is entitled to particular weight because, among all the witnesses, only she was an expert both in the field of clinical research and in studying the effects of alcohol and drugs on human performance.

■ ■ We agree with the trial court that the state offered enough evidence with respect to the scientific acceptance of the DRE protocol to satisfy the *Brown/O'Key* standard. In doing so, we do not discount the testimony defendant offered to controvert the state's witnesses but note that universal acceptance of a technique is not required for admissibility:

> "[C]ontroversy within the scientific community is not necessarily a ground for exclusion of scientific evidence. In deciding whether to admit scientific evidence, a court need not resolve disputes between reputable experts; the evidence may be admissible even though a dispute exists.

---

[13] *See, e.g., Baity*, 140 Wash 2d at 13, 991 P2d at 1158; *Everett*, 972 F Supp at 1323; *Klawitter*, 518 NW2d at 581; *Quinn*, 580 NYS2d at 821.

\* \* \* [T]he witness who testifies to an expert opinion is subject to cross-examination concerning how he or she arrived at that opinion, and \* \* \* in eliciting testimony to vitiate the opinion." *State v. Lyons*, 324 Or 256, 278-79, 924 P2d 802 (1996).

We conclude that, despite the existence of spirited dissent, the DRE protocol has achieved a significant degree of acceptance within the relevant scientific community that weighs in favor of its admissibility for the purpose of establishing the influence of controlled substances.

*The expert's qualifications and stature*

■ The reliability of the protocol's results depends on the ability of the officer who administers it. In order to qualify for DRE training, an officer must be experienced in traffic enforcement and crime scene investigation and be able to conduct field sobriety tests. The officer must then attend a 16-hour pretraining that focuses on observing the effects of drugs on the eyes, taking vital sign readings, and refreshing FST skills. The next step in the certification process is the 56-hour DRE school. It includes instruction on the scientific underpinnings of the protocol, a detailed unit on the eye examinations, an overview of physiology and drugs, additional training on vital sign reading and interpretation, an explanation of signs and symptoms associated with the seven categories of drugs, and practice sessions. Candidates are tested throughout the training. Finally, the candidate must conduct 12 supervised evaluations in which the toxicology results must corroborate the candidate's opinion at least 75 percent of the time.

*O'Key* suggests that training will suffice under this factor, provided that the witness has learned how to "administer the test and accurately record the test results." 321 Or at 317. *But see State v. Futch*, 123 Or App 176, 194, 860 P2d 264 (1993), *aff'd* 324 Or 297 (1996) ("state licensing is not a guarantee of expertise") (citing *Brown*, 297 Or at 425-27). In *O'Key*, the officer had undergone only 16 hours of training, which was held sufficient to qualify him to testify regarding HGN, the most sophisticated part of the DRE protocol. *See O'Key*, 321 Or at 317 (explaining HGN training); *State v. O'Key*, 123 Or App 54, 59, 858 P2d 904 (1993), *aff'd in part,*

*rev'd in part* 321 Or 28 (1995) (same). The 66-plus hours of training DRE officers complete may not compare with the amount of training completed by, for example, witnesses testifying to syndrome evidence. *See State v. St. Hilaire*, 97 Or App 108, 112-13, 775 P2d 876 (1989) (witness had several hundred hours of training). However, the DRE protocol is more closely analogous to HGN testing than to psychological evaluation. Both the DRE protocol and HGN testing apply subjective observations of physiological phenomena to scientific indicia of impairment. Syndrome evidence, on the other hand, generally involves a more subtle assessment of behavioral clues, often with fewer objective factors to confirm or disprove the diagnosis. We conclude that DRE certification suffices to qualify a DRE officer to testify about the administration and results of the protocol.

*The use which has been made of the technique*

■ The parties disagree about the meaning of the third factor. The state understands it to refer to how widely the protocol has been used and argues in support of admission that 33 states, three branches of the military, the IRS, and several foreign countries use all or part of it. Defendant focuses on the goal of the protocol: to determine whether or not a driver is impaired. The case law has not analyzed this factor in detail and is, in fact, not entirely clear on the point. *See, e.g., State v. Lyons*, 124 Or App 598, 607, 863 P2d 1303 (1993), *aff'd* 324 Or 256 (1996) (addressing both the suitability of the PCR method of identifying DNA for forensic use, and the relative lack of widespread use of that method, under the third *Brown* factor). *But see Futch*, 123 Or App at 194, *and Brown*, 297 Or at 427 (discussing extent of use only); *O'Key*, 123 Or App at 59 (discussing goal of use only). Viewed in either light, this factor weighs in favor of admitting DRE testimony. The state has shown that the DRE protocol has been in relatively widespread use for some time. Furthermore, even focusing, as defendant does, on the goal of the protocol, it is apparent that the use to which the protocol is put is fairly rudimentary: to establish the fact of impairment and to predict the broad category of drug which caused the impairment. We conclude that this factor weighs in favor of the DRE protocol's reliability.[14]

_____

[11] This factor is similar to an additional factor listed in *Brown*, "nature and breadth of the inference adduced." 297 Or at 417 n 5. It weighs toward admission,

*The existence of operational standards controlling the technique and the potential rate of error*

██ ██ DRE programs are certified and regulated by the IACP. The NHTSA sets standards for the HGN test that the *O'Key* court held were sufficient for admissibility. 321 Or at 313-14. Defendant argues that the IACP standards are insufficient because they do not provide for decertification of DRE officers who perform poorly. However, as defendant herself points out in her brief to this court, DRE officers must submit a record of all their evaluations to the IACP every two years. If the DRE officer consistently performs poorly, he or she can be decertified. Oregon DRE Standard 4.1; IACP Guidelines 5.3. Based on this oversight of the officer's actual performance and *O'Key*'s ratification of the NHTSA standards for the HGN portion of the test, we conclude that the DRE standards are sufficiently strict to ensure the protocol's reliability.

Defendant declines to estimate the protocol's actual rate of error, arguing that the potential rate of error is quite high, because "the DRE takes a large amount of potentially contradictory information and amalgamates it into a single opinion." She also argues that the academic studies contradict one another and that, therefore, the error rate is currently unknowable. The state responds that the DRE protocol contains a number of checks and balances designed to minimize the error rate, most notably the toxicological analysis at the end of the protocol. Defendant takes issue with the corroborative benefits of urinalysis, due to the fact that drug metabolites remain in the urine for up to a month (in the case of marijuana) after consumption and, conversely, can fail to reveal the presence of very recently ingested drugs that have not metabolized at the time of the test.

We focus on whether proffered scientific evidence has a rate of error low enough that its results can be trusted with "reasonable certainty." *State v. Lyons*, 324 Or at 275. *See also O'Key*, 321 Or at 312-13 (admitting HGN test results as scientific evidence with caveats regarding potential scientific and human-error causes for misdiagnosis, because test is a "fairly reliable" indicator of alcohol impairment). The trial court record contains several studies of the DRE protocol, all

because the inference to be drawn from the results of the DRE protocol is only that some controlled substance is present, not how much.

but one showing an error rate of less than 15 percent. Two were field studies. The first, conducted in Los Angeles in 1985, resulted in a correct conclusion that the subjects were impaired by *some* controlled substance 94 percent of the time, with the substance correctly identified 79 percent of the time. The second study, done in Arizona in 1994, identified a corroboration rate between the results of the protocol and the presence of some controlled substance of 91 percent. Neither of the field studies was peer reviewed or published in a scientific journal. The same is true of the third study, a double blind test conducted at Johns Hopkins University. It showed a 91.7 percent success rate, albeit using a shortened version of the standard DRE protocol. In the final study, which was peer reviewed and published in the Journal of Analytical Toxicology (JAT), the DRE officers' success rate was only 51 percent. However, like the Johns Hopkins study, the JAT study failed to use the complete protocol. Furthermore, the researchers admittedly misled the officers regarding what drugs they would encounter, the subjects were given lower-than-normal doses of drugs, the study was not double blind, and the study sample contained only 18 subjects. We conclude that, due to the limitations inherent to the JAT study, its status as a peer reviewed article does not trump the other studies with which it conflicts. *Accord Jennings v. Baxter Healthcare Corp.*, 152 Or App 421, 429-30, 954 P2d 829, *rev allowed* 327 Or 317 (1998) (nonpeer reviewed study may provide basis for hypothesis); *O'Key*, 321 Or at 304 (peer review relevant, but not dispositive); *but see Futch*, 123 Or App at 189 (peer reviewed study trumped earlier, nonpeer reviewed study).

In addition to examining the studies for evidence of the potential error rate of the DRE protocol, we further note that a false positive elicited by the first 11 steps of the protocol is corrected by toxicology results, at least in those cases in which the subject submits to urinalysis. We find the *Everett* court's conclusion on this issue instructive:

> "While * * * errors are made, such as false negatives, * * * the errors inure to the benefit of the subject, as that person would be released and not charged. For the same reason that the Court would admit the testimony of an officer testifying about his observations and field sobriety tests of an

alcohol intoxicated driver, even though the officer could be wrong, this Court finds the same justification for admitting the testimony of the DRE here for the same purposes. The potential rate of error is certainly sufficiently low to provide probable cause to require a toxicological examination. This Court finds that it is sufficiently within bounds to admit the evidence of the DRE's conclusion as probable cause and circumstantial evidence of the presence of and possible impairment by drugs.

"This Court maintains some reservation about the potential rate of error which causes it to come short of permitting the DRE to testify, with the apparent authority of scientific expertise, that the presence of the particular class of drugs is an established fact. That is the ultimate decision the fact finder can and must make. And, the toxicological report provides more scientifically trustworthy evidence of that fact.[15]

"It bears repeating that the statute or regulation under which the Defendant is charged, does not require the drug, or even the class of drug, to be identified. The ultimate purpose of the DRE program is to train officers in the recognition of the symptoms and conditions present when drugs have been ingested." 972 F Supp at 1324-25.

On the whole, we conclude that the field studies cited by the parties that measured the actual corroboration rate achieved by DRE officers using the full protocol show that DRE evidence meets the requirement of reasonable certainty and reliability outlined in *Lyons* and *O'Key*. Given the requirement of toxicological corroboration of the results, and being mindful of the fact that the *Brown / O'Key* test does not require proof of scientific infallibility, we conclude that the error rate of the DRE protocol, properly conducted, is low enough to justify its admission. In doing so, we caution that the studies on the protocol do not speak to its reliability for assessing a particular level of controlled substances; we therefore do not, at present, approve its use for that purpose.

---

[15] We emphasize again that defendant raises only the question of whether the DRE protocol is, in general, admissible. She does not challenge the weighing of individual steps of the protocol or the admission of DRE testimony on the ground that the record lacks evidence that this defendant submitted to a toxicology screen.

*The existence of specialized literature and peer review*

■ Defendant notes that of the four studies of the DRE protocol mentioned in the record, only one was peer reviewed and argues that the specialized literature/peer review prong of the *Brown/O'Key* analysis therefore weighs heavily against admission. She also criticizes the Los Angeles and Arizona studies as biased, because the Los Angeles study was published by the government and the Arizona study was overseen by state witness Burns. The Johns Hopkins study did not use the full DRE protocol and, at any rate, was neither peer reviewed nor published. According to defendant, the JAT study "calls into question the overall protocol."

The difficulty with defendant's argument is that it attacks the credibility of the literature bolstering the reliability of the DRE protocol, not its existence. Furthermore, she does not cite peer reviewed articles that have effectively "discredited the underlying theory" of the DRE protocol. *See* *Lyons*, 324 Or at 276 ("Defendant has not cited any peer review articles that have discredited the underlying theory of the * * * method [at issue]. In fact, defendant's expert testified that he used [it] in his research. His only concern was the possibility of contamination * * * in a forensic context. We conclude that sufficient specialized literature exists to satisfy this *Brown* factor.") (emphasis omitted). We conclude that specialized literature does exist to satisfy this *Brown/O'Key* factor. The peer reviewed study that does exist does not effectively discredit that literature.

*The novelty of the invention*

■■ Novelty does not, in itself, bar admission of scientific evidence. *O'Key* 321 Or at 302 n 21 ("Novelty does not imply invalidity, because every scientific theory must at some point be 'new.' "); *Lyons*, 124 Or App at 609. The state argues that the DRE protocol is not novel, as it has been used since the late 1970s. According to defendant, that argument misses the point, which is that the DRE protocol is an amalgamation of familiar techniques used for a novel *purpose* and that the novelty of the protocol is in its claim of interpretive value. However, defendant's argument goes to the "use" prong of the *Brown/Daubert* test, not to the novelty analysis. For example, in *O'Key*, 321 Or at 318, the court considered *only* the

length of time that the HGN test had been used (in that case, three decades). The court did not consider that, for some of that time, HGN had been used only in a nonjudicial context, discussing that issue instead under the "use" prong. *Id.* at 317. ("The use that has been made of the HGN test[:] This factor includes non-judicial uses and experience with the HGN test * * *[, which] has been in use for more than 30 years * * *.") In fact, in that case, HGN had only been used for law enforcement purposes in Oregon for 12 years at the time its admissibility was litigated. The DRE protocol has been used for nearly 20 years in other jurisdictions and for five years in Oregon. We conclude that the DRE protocol is sufficiently established that the novelty prong of the test does not bar its admission.

*The extent to which the technique relies on the subjective interpretation of the expert*

 The state cites the testimony of its witness, Burns, as well as *O'Key*, for the proposition that an informed, subjective observation, such as that which comes into play when assessing a subject's FST performance, is valid and admissible. *Id.* at 297-98. Defendant disputes this, arguing that the DRE officer's training emphasizes evaluation of the protocol's results, a mixture of both objective and subjective observations, as a whole, resulting in a conclusion that is, on the whole, subjective. In addition, defendant points out that the changing effect of controlled substances over time—that is, that most drugs have an "up" side and a "down" side—can make identifying symptoms confusing. Furthermore, she notes, when a subject has engaged in poly-drug use, the drug combination involved can distort his or her symptoms. When a subject has taken a combination of drugs at different times, the two problems combine, creating a vast and complex array of symptoms that exacerbates the subjectivity problem.

The DRE protocol does have subjective components, *i.e.*, the subject interview and the FSTs. For the most part, however, the protocol consists of objective observations of certain behavior and physical characteristics that scientific research has shown are common in individuals under the influence of controlled substances. We are not persuaded by defendant's contention that the possibly confusing effect of

poly-drug use renders the entire protocol overly subjective, because that argument misapprehends the purpose of the DRE protocol in context. Defendant fails to take account of the that the crime of DUII-CS does not require precise identification of the type or amount of controlled substance ingested—merely that defendant is impaired by *some* controlled substance. ORS 813.010(1)(b). The effect of poly-drug use on the validity of DRE results in a particular case is certainly an appropriate topic for cross-examination or competing expert testimony. However, that effect does not render the entire DRE protocol inadmissible.

Furthermore, it is questionable whether the DRE protocol as a whole can even be considered "subjective" under *Brown*, because the DRE officer must corroborate his or her opinion with urinalysis. *See O'Key*, 321 Or at 318 (HGN test is "subjective" in part because "[t]he officer who administers the test has no physical sample to take to a laboratory"). Although the protocol has some subjective aspects in common with HGN—such as the induplicability and unverifiability of test conditions that were noted in *O'Key*—in the DRE protocol, the urinalysis is indispensable if the officer believes that the subject is under the influence of a controlled substance. If the urine screen does not corroborate the DRE's opinion, the officer's test is considered a failure. If the DRE officer does not obtain a urine sample, the DRE protocol cannot be considered complete. Those factors vitiate the problem of the DRE protocol's subjectivity, such as it is, and we conclude that the protocol satisfies this portion of the *Brown/Daubert* test.

We further consider, briefly, one additional factor approved in *Brown*: the clarity and simplicity with which the technique can be described and the results explained. *Brown*, 297 Or at 417 n 5. The DRE protocol easily satisfies this factor. It is much more understandable to lay persons than, for example, the various forms of DNA testing that have been approved for use in the Oregon courts. Individually, most of the steps of the protocol do not require an overly technical explanation of their bearing on the DRE officer's conclusion. Because the protocol as a whole merely synthesizes these simple steps, we conclude that the clarity factor weighs in favor of admission.

Our consideration of the various factors that weigh for and against admission of scientific evidence leads us to conclude that the underlying proposition of the DRE protocol—that ingestion of controlled substances causes a variety of symptoms detectable by a trained officer—is sufficiently reliable to justify admission of the protocol's results into evidence. Here, the state is offering the protocol as evidence tending circumstantially to make more probable a fact of consequence—that defendant was under the influence of a controlled substance. For that limited purpose, the DRE protocol is relevant under OEC 401. Furthermore, it meets the helpfulness requirement of OEC 702 by informing jurors of the significance of the results of FSTs and the other components that make up the protocol.

## SHOULD EVIDENCE OF THE DRE PROTOCOL BE EXCLUDED UNDER OEC 403?

OEC 403 provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." Defendant argues that it is impossible to test the DRE protocol under OEC 403 because we do not know its validity. We disagree with that proposition. The state adequately demonstrated, through the studies it introduced into evidence, a reasonably high correlation between the results of the DRE protocol and impairment of the subject.

> "In the context of OEC 403, 'unfair prejudice' does not mean 'evidence is harmful to the opponent's case—a central reason for offering evidence.' [State v.] Hampton, 317 Or [251], 259 n 15[, 855 P2d 621(1993)]. Rather, it means an undue tendency to suggest a decision on an improper basis, commonly although not always, an emotional one. State v. Pinnell, 311 Or 98, 105-06 n 12, 806 P2d 110 (1991). 'Unfair prejudice' describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish the fact of consequence." O'Key, 321 Or at 321.

DRE evidence is not likely to suggest a decision on an improper basis; it does not appeal to passion, prejudice, or

any other impermissible motive. A defendant is free to cross-examine the state's DRE witnesses and to dispute the validity and results of the protocol through contradictory evidence. We conclude that the procedure and the results of the DRE protocol, offered to make more likely the proposition that defendant was under the influence of *some* controlled substance, are not excluded by OEC 403.

For the reasons outlined above, we hold that the procedure and results of the DRE protocol are admissible in a DUII-CS proceeding to show that a defendant was under the influence of a controlled substance. However, the state must make a foundational showing "that the officer who administered the test was properly qualified, the test was administered properly, and the test results were recorded accurately." *Id*. at 322.

Affirmed.