Argued and submitted April 25, 2000, affirmed October 31, 2001, petition for review denied February 19, 2002 (333 Or _____ )

# STATE OF OREGON,
*Respondent,*

*v.*

# POLICARPIO SANCHEZ-CRUZ,
aka Policarpio Cruz Sanchez,
*Appellant.*

## 97-11-38971; A103498

33 P3d 1037

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

## DEITS, C. J.

Defendant appeals from a judgment of conviction for two counts of rape in the first degree, ORS 163.375, and six counts of sexual abuse in the first degree, ORS 163.427. He assigns error to the admission of a medical doctor's diagnosis that the victim had been sexually abused. We review for errors of law, *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299-301, 14 P3d 596 (2000); *State v. Lyons*, 324 Or 256, 279 n 30, 924 P2d 802 (1996), and affirm.

■ Because a jury found defendant guilty, we set out the facts in the light most favorable to the state. *State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993). Defendant rented a room in the victim's family's home beginning in October 1996, just after the victim's tenth birthday. In October 1997, the victim told her mother that defendant had been sexually abusing her. On October 28, 1997, the victim was evaluated by Dr. Bays, the medical director of Child Abuse Response and Evaluation Services (CARES) at Emanuel Hospital in Portland.

Defendant moved *in limine* to exclude any of Bays's testimony containing an opinion that the victim had been sexually abused.[1] Defendant asserted several bases for his motion, only two of which he now pursues on appeal: (1) that such testimony was inadmissible under OEC 401 and OEC 702, because it was scientific evidence for which the state had not established a sufficient foundation under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984); and (2) that the probative value of such testimony would be substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and undue delay under OEC 403.[2]

The trial court denied defendant's motion. The court concluded that the evidence was scientific evidence for which the state had laid a proper foundation under *Brown* and that

---

[1] Defendant did not challenge the admission of testimony regarding Bays's findings during the *physical* examination of child, but in fact affirmatively stated that such testimony was, in his opinion, unobjectionable.

[2] At trial, defendant further argued that Bays's diagnosis constituted an impermissible comment on the credibility of the victim. Defendant does not renew that argument on appeal.

the evidence would assist the jury. Accordingly, the court concluded that the evidence was admissible under OEC 401 and OEC 702. The court also ruled that the evidence was admissible under OEC 403.

At trial, the state called the victim, the victim's mother, a police officer who had responded to a domestic disturbance call involving defendant and mother, a police officer who had investigated victim's allegations, a child protection worker from the State Office for Services to Children and Families, and Bays. For his case-in-chief, defendant took the stand as his only witness. Bays was the only medical professional to testify.

Bays testified that she has worked as a pediatrician at Emanuel Hospital since 1984 and has been evaluating children for signs of sexual abuse since 1985. She belongs to several professional organizations that focus on issues of child abuse and neglect. She regularly attends and instructs at conferences at which methods of child sexual abuse evaluation are discussed. Bays testified that several specialized journals devoted to the topic of child abuse exist and that peer-reviewed articles are regularly published in those journals, as well as in general pediatrics journals. She has published several articles about the methodology of diagnosing child sexual abuse in those journals.

Bays testified that the term "child sexual abuse" represents an accepted medical diagnosis and that the diagnosis and treatment of child sexual abuse is a recognized practice within the medical community. Bays estimated that she has evaluated more than 1,000 children for signs of sexual abuse. Bays described the genesis of the CARES program, which she cofounded. She also testified about the typical CARES evaluation, in which a medical doctor first conducts a physical examination of the child, and then an interviewer trained in child development conducts a videotaped interview with the child. Bays explained that the two evaluators bring different training to the evaluation and consult with one another to reach a diagnosis and recommended treatment plan. Bays testified that a child's "medical history"—that is, the child's responses to questions and statements made by the child during both parts of the evaluation—is an important factor in

the diagnosis of child sexual abuse. She further testified that medical histories are regularly relied upon in areas of medicine outside of the child sexual abuse context and often play a significant role in reaching diagnoses. Bays testified that the evaluation methodology followed by CARES is a standard process in the medical community.

Bays also described the evaluation that she had conducted of the victim in this case. With respect to her physical examination of the victim, Bays testified that the victim had a large hymenal opening for her age and stage of puberty and that the condition of the victim's genitals was consistent with penile penetration. Bays discussed two studies that supported her reasoning about the implications of the victim's physical condition. Bays further testified that the victim's lack of reaction while Bays was using a cotton swab to examine the victim's genitals made Bays concerned that the victim had been exposed to sexual abuse. During the course of Bays's testimony, the state offered a videotape made during the interview portion of the victim's evaluation.[3] Bays explained that she relied on information supplied during the interview in making her diagnosis, in the same way as she would have in taking any medical history. Ultimately, Bays testified that she had reached a diagnosis, based on historical information and confirmed by a physical examination, of child sexual abuse. Bays testified that her diagnosis was made within a reasonable degree of medical certainty.

■ Defendant contends that the trial court should have excluded Bays's diagnosis of child sexual abuse. Defendant first argues that that testimony was scientific evidence for which the state failed to lay a sufficient foundation under *Brown*. We review rulings on whether evidence is scientific and, if so, whether sufficient foundation for its admission was laid under OEC 401 and OEC 702 for errors of law. *Jennings*, 331 Or at 299-301.

---

[3] Defendant objected specifically to the admission of that videotape on the same grounds that he had raised against Bays's testimony generally, but he did not assert any different objections to the tape. Defendant does not assign the admission of the videotape as error on appeal.

In *Brown*, the Supreme Court considered in detail the "gatekeeping" function of the courts with respect to scientific evidence.[4] The court ultimately set out a list of seven factors that courts are to consider "[t]o determine the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702[.]" *Brown*, 297 Or at 417. The court revisited the question of the foundation required for admissibility of scientific evidence in *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995). In *O'Key*, the court adopted aspects of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993), as appropriate factors for consideration in assessing the reliability of scientific evidence. *O'Key*, 321 Or at 306-07.

**3.** The first question presented in this case is whether Bays's diagnosis was scientific evidence. In that respect, as the parties agree, this case presents the same issue that was before this court in *State v. Trager*, 158 Or App 399, 974 P2d 750, *rev den* 329 Or 358 (1999). In *Trager*, as in this case, the defendant was charged with sexual abuse and moved *in limine* to exclude expert testimony concerning the medical diagnoses of sexual abuse of the victims. 158 Or App at 401-02. The trial court ruled that the evidence was admissible, subject to a proper foundation being laid for it under *Brown*.

---

[4] Statements in some cases may be read to suggest that *only* scientific evidence, and not other expert testimony, is subject to the courts' "gatekeeping" role. *E.g.*, *State v. Sampson*, 167 Or App 489, 496, 6 P3d 543, *rev den* 331 Or 361 (2000) (determining that evidence at issue was "scientific evidence subject to the judicial gatekeeping function"); *State v. Trager*, 158 Or App 399, 405-06, 974 P2d 750, *rev den* 329 Or 358 (1999) (Landau, J., concurring) (because evidence was scientific, it was "precisely the sort of evidence that is subject to the gatekeeping review of the courts"). It is by no means clear, however, that courts are not to exercise a gatekeeping role with respect to *all* expert testimony. *Brown* couches much of its discussion and conclusions in terms of "expert testimony" generally, not "scientific evidence" particularly. 297 Or at 408-09. The provisions of the Oregon Evidence Code, on which the court in *Brown* based its analysis, do not distinguish among different kinds of expert testimony. OEC 401; OEC 702; OEC 403. *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 590 n 8, 113 S Ct 2786, 2795 n 8, 125 L Ed 2d 469, 480 n 8 (1993) (noting that FRE 702 also applies to "technical, or other specialized knowledge," but that its discussion was limited to the scientific context because of the nature of the expert testimony offered in that case); *State v. O'Key*, 321 Or 285, 293, 899 P2d 663 (1995) (noting that, in case in which court concluded evidence was "scientific," it was not necessary to distinguish scientific from other types of expert testimony).

After his conviction, the defendant appealed and, like defendant in this case, argued that the diagnosis was scientific evidence for which the state had not laid a sufficient foundation. *Trager*, 158 Or App at 402-03.

*Trager* was resubmitted *en banc*, resulting in a decision in which eight judges participated. All eight judges agreed that the evidence was properly admitted. However, the court split evenly on the question of whether a medical diagnosis of sexual abuse is "scientific evidence" to which the *Brown* analysis applies. Judge Edmonds, joined by Judges De Muniz and Haselton, concluded that a medical diagnosis of sexual abuse is not scientific evidence. After reviewing pertinent case law, Judge Edmonds concluded that the

> "testimony concerning the diagnoses of sexual abuse is not 'syndrome' or 'profile' evidence because it does not draw its convincing force from generalizations based on empirical data or an empirical study. Moreover, * * * [the] testimony concerned differential diagnoses made in light of [the doctor's] education, training and experience after personally examining the victims. The weight or force of those diagnoses was derived from [the doctor's] technical and specialized knowledge as a medical doctor. In that light, we conclude that [the] testimony in this case was not 'scientific evidence' within the meaning of *Brown*."

*Trager*, 158 Or App at 405.

Judge Warren concurred. He agreed with Judge Edmonds that the testimony was not "scientific evidence." Judge Warren, however, would have applied an even narrower reading of *Brown*, which he opined should be applied only when the methodology for gathering scientific evidence is novel. *Trager*, 158 Or App at 405 (Warren, J., concurring); *see State v. Stafford*, 157 Or App 445, 466-68, 972 P2d 47 (1998) (Warren, J., concurring), *rev den* 329 Or 358 (1999) (more fully explaining Judge Warren's view of the limited circumstances in which *Brown* should be applied). *But see O'Key*, 321 Or at 294 n 9, ("Although *Brown* focused on 'novel' scientific evidence, it is not limited to 'novel' scientific evidence.").

Judge Landau also concurred, joined by Judges Deits, Armstrong, and Wollheim. According to Judge

Landau, to decide whether evidence is "scientific" for purposes of the Oregon Evidence Code, "the determinative consideration is whether the testimony is such that juries will *perceive* it to have a basis in science and thereby regard it as having correspondingly enhanced persuasive force." *Trager*, 158 Or App at 407 (Landau, J., concurring) (emphasis in original).

At the time we decided *Trager*, the Oregon Supreme Court had not addressed the question of whether a diagnosis by a medical doctor is scientific evidence. *See O'Key*, 321 Or at 297 (horizontal gaze nystagmus test evidence is scientific evidence); *State v. Milbradt*, 305 Or 621, 630-31, 756 P2d 620 (1988) (*dictum* suggesting that testimony about the way child abuse victims normally react to child abuse might be scientific evidence); *Brown*, 297 Or at 438 (polygraph evidence is scientific evidence). Since *Trager*, however, the court decided *Jennings*, which sheds considerable light on the question.

In *Jennings*, the plaintiff brought a product liability action against the manufacturer of her silicone breast implants. She alleged that silicone from the implants had migrated throughout her body, causing personal injury. *Jennings*, 331 Or at 288. At trial, the plaintiff called Dr. Grimm, a neurologist, to testify that there was a causal relationship between silicone and certain neurological symptoms and that, in his opinion, silicone caused the plaintiff's neurological conditions. *Id.* at 288-94. Put more generally, the plaintiff sought to introduce testimony that a certain medical condition existed and that she suffered from that diagnosed condition. The trial court agreed with the plaintiff's " 'theory that [*O'Key*] doesn't apply to medical doctors who are coming in and giving a diagnosis based on their specialty.' " *Id.* at 294-95.

The Supreme Court reversed. After reviewing the principles of law set out in *Brown* and *O'Key*, the court began its analysis by rejecting the plaintiff's assertion that her proffered evidence was not scientific:

> "*A jury is likely to believe that a doctor's testimony about medicine is a scientific assertion and, therefore, the proponent of the testimony must show that it is scientifically valid.*

"Evidence is scientific when it 'draws its convincing force from some principle of science, mathematics and the like.' *Brown*, 297 Or at 407. 'Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation.' *O'Key*, 321 Or at 292. * * *

"*Clinical diagnoses bear the marks of science.* A medical doctor gathers information from a patient to develop a working diagnosis (a hypothesis), then uses that working diagnosis to gather further information or to specify tests that will confirm or refute the working diagnosis. [Federal Judicial Center, *Reference Manual on Scientific Evidence*, 463-64 (2d ed 2000).]

" 'The goal of the clinician is to arrive at a diagnosis that can be used to develop a rational plan for further investigation, observation, or treatment, and ultimately to predict the course of the patient's illness * * *. To do this, the clinician must verify or validate the diagnostic hypothesis.'

"*Id.* at 464. *See also O'Key*, 321 Or at 292 ('The scientific method is a validation technique, consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses.')."

*Jennings*, 331 Or at 304 (emphasis added). The court then applied the *Brown / O'Key* factors, determined that the plaintiff's proffered evidence was sufficiently reliable, and accordingly concluded that the trial court had erred in holding that the evidence was inadmissible. *Id.* at 305-10.

■ We understand *Jennings* to establish that the primary criterion for determining whether evidence is "scientific" is the likelihood that a jury will view evidence as scientific. *See* 331 Or at 304 ("A jury is likely to believe that a doctor's testimony about medicine is a scientific assertion and, therefore, the proponent of the testimony must show that it is scientifically valid."). As the court applied that criterion in *Jennings*, a jury is likely to view a doctor's diagnosis of a patient as suffering from a particular disease as scientific. The proffered evidence in this case is similar in nature

to some of the disputed evidence in *Jennings*: a medical diagnosis based on a patient's medical history. *Id.* at 292 (describing doctor's testimony as including a diagnosis of the plaintiff based on " 'taking a careful clinical history' "). In *Jennings*, the Supreme Court concluded that such a medical diagnosis is scientific evidence. *Id.* at 304. As the court explained in *Jennings*, a "[c]linical diagnos[i]s bear[s] the marks of science." *Id.* Accordingly, because it possesses significantly increased potential to influence jurors as a scientific assertion, a diagnosis of child sexual abuse is "scientific" evidence that must be subjected to the foundational requirements of *Brown* and *O'Key*.

Defendant argues that the state did not establish that a diagnosis of child sexual abuse based in part on a case history satisfies those foundational requirements. In *Brown*, the court set out a list of seven factors that courts are to consider in assessing the reliability of scientific evidence. Those factors are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417. The court explained that "[t]he existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702." *Id.* at 417-18 (footnotes omitted). As the court further explained in *O'Key*, "scientific" evidence, to be admissible, must be supported by a showing that the evidence is based upon scientifically valid principles, *i.e.,* "sound scientific reasoning or methodology." 321 Or at 302. In conducting this

inquiry, we focus on the methodology followed, not on the conclusions reached. *Jennings,* 331 Or at 305.

■ In this case, the state established that the methodology Bays followed is scientifically valid. Case histories, like the one conducted in this case, are regularly relied on in reaching medical diagnoses. The evaluation methodology followed by Bays in diagnosing child sexual abuse is a standard in the medical community. Child sexual abuse is a generally accepted medical diagnosis that is not novel and that is widely used by medical professionals. Several medical professional organizations and peer-reviewed journals are devoted to topics of child sexual abuse, including methods of diagnosis. Bays's qualifications and stature in her field are strong; she has been evaluating children for signs of sexual abuse for more than 15 years, she instructs other doctors and has published articles about techniques for diagnosing child abuse, she has evaluated more than 1,000 children for signs of sexual abuse, and she helped found the CARES program at Emanuel Hospital.

Defendant, like the defendant in *Trager*, principally objects to the potential rate of error for this diagnosis and to the extent to which it relies upon an expert's subjective interpretation. Both objections, however, may be said of many recognized medical diagnoses. Furthermore, as the Supreme Court has made clear, satisfaction of each of the *Brown* factors is not required to make scientific evidence admissible. We conclude that the methodology followed by Bays in reaching her diagnosis of child sexual abuse in this case is reliable scientific evidence and, accordingly, the trial court did not err under OEC 401 and OEC 702 in admitting it.

■■ Defendant also argues that the probative value of Bays's diagnosis was substantially outweighed by reasons for exclusion under OEC 403. We review OEC 403 rulings where scientific evidence is at issue for errors of law. *Lyons,* 324 Or at 279 n 30. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

As the Supreme Court explained in *O'Key*, OEC 403 generally favors admissibility, while at the same time providing the means of excluding distracting evidence from a trial. 321 Or at 320. The court noted that the "substantially outweighed" language in OEC 403 places the burden on the party seeking exclusion of the evidence. *Id.*

Defendant makes several arguments as to why the trial court should have excluded Bays's diagnosis under OEC 403. First, defendant contends that a jury is likely to give a medical diagnosis of sexual abuse weight beyond its true value for reasons not related to its probative value, namely the status of physicians, disdain for those charged with child abuse, and assessment of the truthfulness inherent in such a diagnosis. Second, defendant argues that allowing medical diagnoses of child sexual abuse will lead to confusion of the issues and undue delay because it will lead to "battles of the experts." Finally, defendant argues that child sexual abuse diagnoses should be excluded under OEC 403 in order to avoid questions about whether a victim in a criminal case can be compelled to submit to an examination at the request of a defendant.

■ We turn first to defendant's unfair prejudice argument.[5] Evidence is unfairly prejudicial under OEC 403 if it appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact. *State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den* 528 US 1135 (2000). As the Supreme Court explained in *O'Key*, "unfair prejudice" does not mean "evidence is harmful to the opponent's case." 321 Or at 321 (internal quotation marks omitted). As the court pointed out, that is a central reason for offering evidence. Rather, it means an "undue tendency to suggest a decision on an improper basis, commonly although not always an emotional one." *Id.*

Defendant largely relies on *Brown* in support of his unfair prejudice argument. In *Brown*, after concluding that polygraph evidence was scientific evidence and that it might possess probative value and be helpful to a trier of fact, the

---

[5] As noted above, 177 Or App at 334 n 2, defendant does not argue on appeal that Bays's testimony was an impermissible comment on the credibility of a witness.

court considered whether the polygraph evidence in that case should be excluded under OEC 403. 297 Or at 438-42. The trial court in *Brown* had concluded that the polygraph evidence offered in that case carried a high likelihood of being overvalued by the jury. Consequently, it excluded the evidence. The Supreme Court explained that OEC 403 requires courts "to evaluate the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment." *Id.* at 439. The court determined that, because "[b]y its very nature the polygraph purports to measure truthfulness and deception," it was likely that a jury would place undue weight on polygraph evidence. *Id.* at 440. The court also noted that polygraph evidence presented concerns of undue delay, because of the few licensed polygraphers available as witnesses in Oregon. Finally, the court observed that the introduction of polygraph evidence could lead to time-consuming and confusing battles of experts. In light of the presence of several OEC 403 factors weighing against admission, the court held that the trial court had not erred in concluding that the probative value of the evidence was substantially outweighed by reasons against admission. *Id.* at 442.

Defendant contends that diagnoses of child sexual abuse present similar reasons against admission as polygraph evidence. According to defendant, when a CARES physician testifies, the jury "hears from a person stamped with the law's 'expert' seal of approval." He argues that jurors are especially likely to overvalue medical testimony in child sexual abuse cases, where jurors are already likely to be prejudiced against the defendant. Finally, defendant suggests that, like polygraphs, medical diagnoses of child sexual abuse by their very nature measure truthfulness and deception.

We reject defendant's contention that the qualification of a witness as an expert somehow "stamps" the expert with "legal" approval. Under defendant's reasoning, the testimony of *any* expert would be unduly prejudicial. Furthermore, we are unpersuaded that whatever prejudice a jury might feel against a person charged with child sexual abuse has more than speculative bearing on the weight a jury will

place on medical testimony. Finally, we disagree that a medical diagnosis based in part on medical history *per se* measures truthfulness and deception as does a polygraph examination. The sole purpose of a polygraph is to determine whether or not the subject is telling the truth. By contrast, the purpose of a medical examination is to diagnose and plan treatment for illness or injury. Moreover, a polygrapher is looking for physical cues that a subject is telling the truth or lying, while a medical doctor, like Bays in this case, considers physical conditions during an examination of the patient's body, as well as responses to questions, and evaluates findings from the physical and verbal examination to reach his or her conclusions. Those conclusions are not that a patient is or is not truthful, but that the patient's physical condition and verbal report are consistent with a particular illness or injury. The reasons that such testimony would be persuasive to a jury are related to its power to establish a material fact, namely whether the victim was sexually abused, not to its power to appeal to preferences of the jury not related to material facts. We conclude that Bays's diagnosis of child sexual abuse was not unfairly prejudicial.

We also reject defendant's argument that the danger of "battles of the experts" substantially outweighs the probative value of a diagnosis of child sexual abuse. According to defendant, if the state is allowed to offer diagnoses of child sexual abuse, defendants will try to offer testimony from their own experts undermining those diagnoses. Defendant argues that, as in *Brown*, this could lead to a time-consuming and confusing battle of the experts.

The Supreme Court in *Brown* did rely on the likelihood of "battles of the experts" as one factor supporting its conclusion that other OEC 403 factors substantially outweighed the probative value of polygraph evidence. 297 Or at 441. Defendant omits, however, that in *Brown* the court was concerned about expert battles *about the probative value of polygraph testimony. See id.* at 441-42. Defendant does not argue, nor could he, that child sexual abuse diagnoses lack probative value. Moreover, as noted, concern about expert battles was only one factor supporting the court's conclusion in *Brown* that other OEC 403 factors substantially outweighed the probative value of the evidence. Even if expert

battles were to occur in child sexual abuse cases, we are not convinced that they would be any more time consuming or confusing than competing medical testimony generally is. Concerns about the effects of expert battles in these circumstances do not outweigh the probative value of the evidence.

■ Finally, defendant suggests that we should conclude that diagnoses of child sexual abuse are inadmissible because to allow them "raises the spectre" of the question of whether a criminal defendant can compel a state's witness to submit to an examination. *See State v. Hiatt*, 303 Or 60, 64-68, 733 P2d 1373 (1987) (affirming denial of the defendant's motion to compel victim to submit to psychological examination). We reject that argument because it was not raised to the trial court and, put more bluntly, the question is not at play in this case. Defendant asserts that various constitutional rights of criminal defendants will be violated if defendants may not compel victim examinations in these circumstances. However, in this case, he did not ask the trial court for such an examination. We decline to consider the question in this speculative posture. Defendant failed to establish that the probative value of this evidence was substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay or cumulative evidence.

To summarize, diagnoses of child sexual abuse are "scientific evidence" as defined in *Brown*, *O'Key*, and *Jennings*. In this case, the state laid a sufficient foundation under *Brown* supporting the admission of Bays's diagnosis of child sexual abuse; the evidence was sufficiently probative under OEC 401 and OEC 702. Finally, the probative value of that diagnosis was not substantially outweighed by any of the reasons against admission in OEC 403. The trial court did not err in denying defendant's motion to exclude Bays's diagnosis.

Affirmed.