Argued and submitted September 5, 2013, affirmed March 26, 2014

LUIS ARMANDO MESTA,
*Petitioner-Appellant,*

*v.*

Steve FRANKE,
Superintendent,
Two Rivers Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV101065; A148979

322 P3d 1136

Rankin Johnson, IV, argued the cause for appellant. On the brief were Erin Galli and Chilton & Galli, LLC.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

Nakamoto, J., dissenting.

**EGAN, J.**

Petitioner appeals a general judgment that denied him post-conviction relief. In 2007, petitioner was convicted on four counts of first-degree sexual abuse following a jury trial at which a doctor testified that he had diagnosed sexual abuse in three of the five alleged child victims. Petitioner appealed to this court; his appellate counsel argued that admitting those diagnoses was error because they amounted to improper comments on the truthfulness of the child witnesses. We affirmed petitioner's conviction; the Supreme Court subsequently denied review. Petitioner sought post-conviction relief, asserting, among other things, that his appellate counsel was constitutionally inadequate for failing to raise an argument that the admission of the doctor's diagnoses of sexual abuse violated OEC 403. Petitioner asserts that his appellate counsel should have raised that issue in this court after the Supreme Court accepted the petition for review in *State v. Southard*, 347 Or 127, 218 P3d 104 (2009). We affirm.

The facts are not in dispute. Petitioner was charged with six counts of first-degree sexual abuse and two counts of sodomy. One of the sexual abuse counts and the two sodomy counts were dismissed, and petitioner was tried by a jury on the remaining five sexual-abuse counts. The state alleged that petitioner touched the breasts of five children, S, C, T, H, and A, while working as a receptionist at a children's health clinic. All five of the children testified at trial.

During the state's case, it sought to introduce the testimony of Dr. Oddo, a pediatrician and the director of the Jackson County Children's Advocacy Center. Petitioner objected to Oddo's testimony.[1] Following an offer of proof outside the jury's presence, the trial court overruled petitioner's objection and allowed Oddo to testify.

Oddo began by stating that he had extensive experience in child sexual abuse cases and that he had conducted interviews and examinations of approximately 1,500 to 1,800 children over a seven-year period. He also stated

---

[1] We discuss the grounds for petitioner's objection below. 261 Or App at 774-77.

that he had attended national conferences specializing in child abuse and that he was responsible for training others to diagnose sexual abuse. Oddo testified that he had interviewed S, C, T, H, and A for the purpose of evaluating whether they had been sexually abused. Oddo outlined the procedure he generally followed in assessing a sexual abuse claim. He explained that he began by interviewing each child's parent or caregiver; he would then interview the child to gather his or her "history" in order "to find out what has happened to them to figure out what I'm go[ing to] do with them when I'm done examining them and taking the history." Finally, Oddo would perform a "head to toe" physical exam, which ordinarily included an inspection of the child's genitalia and rectal area for signs of sexual abuse.

S reported to Oddo that there had been an incident at petitioner's place of employment. With respect to the results of S's physical exam, Oddo stated that "[S] had a normal exam in regards to sexual abuse." The state then asked Oddo whether he had been able to make a diagnosis of S. He replied, "Yes. My assessment was[,] based on the history and physical exam[,] she was sexually abused."

The state next asked Oddo about C, who had refused to allow him to perform an examination of her genitalia or rectal area. When asked whether he was able to make a diagnosis with respect to C, Oddo replied, "Yes. I'm able to make a diagnosis that she was sexually abused based on her history."

When asked about T, Oddo stated that he obtained "the same background information" from her as he had from S. He then stated that "[s]he had a normal physical exam." The state then asked whether he had been able to make a diagnosis of T; he replied, "She was sexually abused."

With respect to H, Oddo stated that he had performed an examination of her pursuant to the same procedures described above. Oddo noted that H reported an incident of abuse that took place many months before the other alleged incidents. The state asked Oddo whether the delay in H's reporting "play[ed] into [his] diagnosis in any way." He replied that such a delay was not "worrisome" and stated "[t]hat's the most common thing we see that they do." Aside

from the reference to a "diagnosis" in the above-quoted question, the state did not directly ask Oddo whether he had diagnosed H as having been sexually abused.

Similarly, Oddo stated that he had performed an examination of A and that A had reported an incident of abuse at petitioner's workplace. Oddo was not asked to provide a diagnosis for A.

After he had outlined his examinations of the children, the state asked Oddo whether he had experience with children fabricating incidents of sexual abuse:

"[ODDO]: Yes.

"[THE STATE]: Could you describe that please. Is that unusual? And just in your training and experience why that phenomenon would happen?

"[ODDO]: The most common cases we see are actually in teenagers for a variety of reasons. If they have sexual contact with someone and they decide that that was not a bad [sic] idea, or if they think they could potentially be in trouble with their parents for that reason, or—there's a lot of reasons. But we have teenagers that will come in and report sexual assault when it does not happen.

"There are cases where, due to a caregiver wanting to get back at someone[,] or custody disputes, where a child could potentially be coached into a false disclosure of sexual abuse. We see those as well.

"[THE STATE]: You said teenagers. Are the girls whose exams you've already spoken about here, are those latency age children?

"[ODDO]: Yeah. They're preteens.

"[THE STATE]: Okay. In your training and experience, have you had a child of that age make up an incident?

"[ODDO]: A child of that age.

"[THE STATE]: Latency age. Tell us what that is, latency age?

"[ODDO]: Well, I mean really, you know, it's sort of like for medicine when you become a teenager is when puberty starts, but for most people's diagnosis, it's gonna be like 12

and above for girls, they're gonna be started to consider to be teenagers. So, prior to age 12 would be pre-teen.

"[THE STATE]: Have you had children in that age range make up a sexual abuse incident?

"[ODDO]: Yes.

"[THE STATE]: And in your training and experience, are there particular factors or red flags that you look for?

"[ODDO]: Yeah. In pre-teens, it would be because they are out to get someone. I mean, if they have a stepfather that they did not like, didn't want to live with, or something like that where they're out to get them, they can make a false report of sexual abuse.

"[THE STATE]: They're out to get somebody. You said a stepfather or someone else. In your training and experience, have those people been related to the false reporter?

"[ODDO]: As best as I can remember. There's actually not that many cases. But as best I can remember in pre-teens, most of them will be an issue of someone living in their home, making up that story.

"[THE STATE]: In your training and experience, has the false incident regarding children that age included more than one child?

"[ODDO]: It is possible that there [will] be siblings in those cases. I don't remember a specific case where there are siblings, but there is a possibility. 'Cause I don't remember the ages.

"[THE STATE]: Oh, that's okay. What about unrelated, back to the—I'm still referencing the last question. In your training and experience, more than one reporter that's not related to each other?

"[ODDO]: In pre-teens, I haven't seen that.

"[THE STATE]: It is possible?

"[ODDO]: It is possible.

"[THE STATE]: How long have you been doing this again?

"[ODDO]: Since 1993.

"[THE STATE]: Approximately 14 years?

"[ODDO]:   Yes.

"[THE STATE]:   And you've never seen the phenomenon I've just described?

"[ODDO]:   I mean, one of the issues is it can be difficult for me to tell whether for sure if someone is making it up.

"[THE STATE]:   Why is that?

"[ODDO]:   Because I'm not really an investigator. I'm not gonna talk to the suspect, I'm not going to go and talk to corroborating witnesses. I'm just gonna take a history from the patient. There are times when we have teenagers that are friends that come in and make a report of sexual abuse. And for me to know that they were fabricating it, it's gonna be hard for me to know, just taking their history.

"[THE STATE]:   And all of these questions have assumed that you figured out at some point they were fabricating the story, how was it that you determined that they were fabricating the story?

"[ODDO]:   Yes, I mean, it takes looking at the case as a whole, but in children that are being coached, there may not be specific details, they may change the details too much, they may tell stories that are just not possible or just not plausible. It's gonna be those type of details. But in children that are telling specific details, they know exactly who, what, when, where, why, that it's obvious that emotionally when they're talking to you that this event has had an impact on them, that it's embarrassing for them to talk about, those are all signs that it's truthful."

On redirect examination, Oddo explained why he found the children's reports credible in this particular case:

"I mean, one of the things that I do during the evaluation * * * I have to look at the history as a whole to pick out one specific line of a history and say, 'Well, that detail is not right.' It's relatively common. I mean a lot of times kids have very consistent stories, but there may be some detail that has changed. What I'm looking for is do they know the person, do they know what happened to them, do they know where they were, you know, what type of details are they describing of the incidences of touching.

"* * * * *

"In these cases * * * because the incidents happened one time, I'm looking for specific details of what happened that one time and what they know about what happened."

Oddo was then asked whether it would have been appropriate for him to look at the children's medical records as a part of his examination. He replied:

"I'm sure I would take it into consideration, but I'm really looking for a specific incident. I'm really looking at one specific incident and trying to figure out what's happened to them during that incident. So unless those reports contain a lot of information about that incident, they're not gonna be helpful to me. But it's in the same way I don't review police reports, I don't review DHS reports. I get a very brief history from the caregiver, just to sort of let me know the background about what's happening. But really my assessment [is] based on my interaction with the child."

The jury found petitioner guilty of four counts of first-degree sexual abuse, but acquitted him on the charge that he had sexually abused H. Defendant appealed the resulting judgment of conviction to this court. In his opening brief, he asserted that the admission of Oddo's diagnoses that S, C, and T had been sexually abused was in error. Petitioner's specific argument was that each diagnosis was an impermissible comment on each child's credibility as a witness.[2] *See State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) ("[I]n Oregon[,] a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth.").

Twelve days after petitioner filed his opening brief in this court, the Oregon Supreme Court accepted review in *Southard*, a child-sexual-abuse case in which the defendant was convicted by a jury of three counts of sodomy, 347 Or at 132. The charged conduct was not of the sort that left physical evidence of abuse. The child victims in that case, a boy and a girl, were each evaluated at the KIDS Center, a nationally accredited medical facility that examined child victims for the purpose of detecting abuse. Following national- and state-recognized procedures and guidelines,

---

[2] Petitioner also assigned error to the trial court's refusal to give a special jury instruction requiring a unanimous verdict.

KIDS assigned a social worker and a physician to examine each child. The social worker interviewed the children's mother and foster mother, and conducted an interview with each child. The physician conducted a physical examination for signs of sexual abuse; none were detected. After considering the obtained information, the physician diagnosed the boy as having been sexually abused.

Before trial, the defendant moved, *in limine*, to exclude evidence of the doctor's diagnosis on the grounds that it was "scientific evidence" under OEC 702 and that there was an insufficient foundation to admit that diagnosis. The trial court denied the motion. On appeal to this court, the defendant argued that the diagnosis of sexual abuse did not meet the foundational requirements for scientific evidence under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995); he also argued that the diagnosis constituted an improper comment on the child witnesses' credibility. We affirmed the defendant's conviction without opinion. *State v. Southard*, 214 Or App 292, 164 P3d 351 (2007), *rev'd*, 347 Or 127, 218 P3d 104 (2009).

In overturning our decision, the Supreme Court began by stating the three criteria that govern when scientific evidence is admissible: "It must be relevant, OEC 401; it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702; and its prejudicial effect must not outweigh its probative value, OEC 403." *Southard*, 347 Or at 133. The court began with the question of whether the evidence—*viz.*, a diagnosis of sexual abuse in the absence of physical evidence—had sufficient scientific validity to be admissible. After a consideration of the procedures and methodologies employed by the KIDS Center, the court concluded that the "diagnosis possesses sufficient indicia of scientific validity to be admissible." *Id.* at 138-39 (footnote omitted). The court also concluded that the evidence was relevant under OEC 401. *Id.* at 139.

The court then turned to the third part of the analysis, "whether, under OEC 403, the probative value of the diagnosis 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation

of cumulative evidence.'" *Id.* The court determined that the diagnosis was of "marginal" probative value because it "did not tell the jury anything that it was not equally capable of determining * * *." *Id.* at 140. The court reasoned that "whether defendant caused the boy to engage in oral sex * * * does not present the sort of complex factual determination that a lay person cannot make as well as an expert." *Id.*

The court next turned to the unfair prejudice portion of the analysis, concluding:

> "The risk of prejudice, however, was great. The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.' [*Brown,* 297 Or at 439]. As in *Brown,* the diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible. *See id.* at 440-41 (reasoning that polygraph evidence could effectively take over the jury's traditional function of judging the credibility of witnesses). In our view, the risk of prejudice substantially outweighs the minimal probative value of the diagnosis."

*Id.* at 140-41. The court then stated, "We hold that where, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403." *Id.* at 142.

Before the Supreme Court's decision in *Southard,* Oregon's approach to the admissibility of a diagnosis of sexual abuse under OEC 403 was explained in *State v. Sanchez-Cruz,* 177 Or App 332, 33 P3d 1037 (2001), *rev den,* 333 Or 463 (2002). There, a doctor testified that she had diagnosed sexual abuse based on both a physical examination of the child victim and historical information provided by the child. The physical examination revealed that the child had a large hymenal opening for her age and stage of puberty. The doctor stated that the victim's genitals were consistent with penile penetration and that the victim's lack of reaction

to a swab taken by the doctor was further cause for concern. The defendant argued that the doctor's diagnosis was inadmissible scientific evidence. We began by examining whether the diagnosis met the foundational requirements of OEC 401 and OEC 702. We concluded that it did, stating, "[T]he methodology followed by [the doctor] in reaching her diagnosis of child sexual abuse in this case is reliable scientific evidence and, accordingly, the trial court did not err under OEC 401 and OEC 702 in admitting it." *Id.* at 342.

We then turned to whether the diagnosis complied with OEC 403. The defendant argued that the jury would give undue weight to such evidence because of the status of physicians, disdain for those accused of sexual abuse, and the inherent comment on the credibility of the reporting child. *Id.* at 343. The defendant also argued that admission of diagnoses would lead to confusion of the issues and undue delay. We disagreed:

> "We reject defendant's contention that the qualification of a witness as an expert somehow 'stamps' the expert with 'legal' approval. Under defendant's reasoning, the testimony of *any* expert would be unduly prejudicial. Furthermore, we are unpersuaded that whatever prejudice a jury might feel against a person charged with child sexual abuse has more than speculative bearing on the weight a jury will place on medical testimony. Finally, we disagree that a medical diagnosis based in part on medical history *per se* measures truthfulness and deception as does a polygraph examination. The sole purpose of a polygraph is to determine whether or not the subject is telling the truth. By contrast, the purpose of a medical examination is to diagnose and plan treatment for illness or injury. Moreover, a polygrapher is looking for physical cues that a subject is telling the truth or lying, while a medical doctor * * * considers physical conditions during an examination of the patient's body, as well as responses to questions, and evaluates findings from the physical and verbal examination to reach his or her conclusions. Those conclusions are not that a patient is or is not truthful, but that the patient's physical condition and verbal report are consistent with a particular illness or injury. The reasons that such testimony would be persuasive to a jury are related to its power to establish a material fact, namely whether the victim was sexually abused, not

> to its power to appeal to preferences of the jury not related to material facts."

*Id.* at 344-45 (emphasis in original).

Returning now to the facts of this case, petitioner filed his opening brief in his direct appeal to this court on April 4, 2008. Twelve days later, the Supreme Court accepted the petition for review in *Southard*. On October 28, 2008, the state filed its answering brief in petitioner's case; this court heard oral arguments on February 27, 2009; on March 25, 2009, we affirmed the convictions without opinion. Petitioner then filed a petition for review in the Supreme Court on May 22, 2009; several weeks later, the Supreme Court issued an order holding that petition in abeyance pending the decision in *Southard*, which eventually issued on October 1, 2009. The Supreme Court then denied the petition for review on January 21, 2010. The appellate judgment in petitioner's case issued on March 25, 2010.

Six days later, we issued opinions in *State v. Lovern*, 234 Or App 502, 228 P3d 688 (2010), and *State v. Merrimon*, 234 Or App 515, 228 P3d 666 (2010). In both of those cases, we exercised our discretion, in light of *Southard*, to reverse a trial court's admission of a diagnosis of sexual abuse as a matter of plain error. Several days after those decisions, petitioner's appellate counsel filed motions with this court to recall the appellate judgment, for relief from default, and for leave to file a petition for reconsideration. Counsel argued that his case was not meaningfully distinguishable from *Lovern* or *Merrimon* and urged us to reverse petitioner's conviction as plain error. We summarily denied those motions; petitioner then sought review in the Supreme Court, but his petition was denied.

Acting *pro se*, petitioner timely filed for post-conviction relief under ORS 138.510 to 138.680. Before the post-conviction court, he contended that he had received ineffective assistance of both trial and appellate counsel in violation of both the state and federal constitutions. In a general judgment, the post-conviction court concluded that petitioner was not entitled to relief, stating that there was "[n]o inadequacy by either attorney, no prejudice." On appeal,

petitioner does not maintain that his trial counsel was constitutionally defective in any respect; instead, his sole contention is that his appellate attorney's failure to raise the OEC 403 argument that ultimately succeeded in *Southard* denied him constitutionally adequate appellate counsel.

Our review of post-conviction proceedings is limited to review for legal error. *Wilson v. Armenakis*, 144 Or App 587, 589, 928 P2d 354 (1996), *rev den*, 324 Or 560 (1997).

> "To prevail on a post-conviction claim of inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, a petitioner must prove, by a preponderance of the evidence, facts demonstrating that counsel failed to exercise reasonable professional skill and judgment and that the petitioner suffered prejudice as a result."

*Holloway v. Gower*, 225 Or App 176, 180, 200 P3d 584 (2009). "To prevail under the Sixth Amendment, a petitioner must prove that counsel's performance 'fell below an objective standard of reasonableness *** under prevailing professional norms' and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984)) (omission in *Holloway*).

> "A plaintiff seeking post-conviction relief stemming from a claim of inadequate assistance of appellate counsel for failing to assert a claimed error must establish (1) that a competent appellate counsel would have asserted the claim, and (2) that had the claim of error been raised, it is more probable than not that the result would have been different. In short, the post-conviction plaintiff must show that he or she was prejudiced."

*Guinn v. Cupp*, 304 Or 488, 496, 747 P2d 984 (1987). "Whether [petitioner] was denied the assistance of effective appellate counsel raises these questions: Could the claim have been raised on the first appeal? Should the claim have been raised? With what result?" *Id.* at 494-95.

We begin with petitioner's assertion that his appellate counsel failed to exercise reasonable professional skill and judgment by failing to raise an OEC 403 argument in

this court.[3] Although only "general statements can be made about what constitutes the exercise of professional skill and judgment[,]" *Burdge v. Palmateer*, 338 Or 490, 493, 112 P3d 320 (2005), several principles are well established. "If a lawyer exercising reasonable professional skill would have recognized the existence of an issue and would have concluded under the circumstances that the benefits of raising it outweighed the risks of doing so, failing to raise the issue may constitute inadequate assistance." *Krieg v. Belleque*, 221 Or App 36, 40, 188 P3d 413, *rev den*, 345 Or 317 (2008). "In considering a claim of inadequate assistance of counsel, we make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Burdge*, 338 Or at 492 (internal quotation marks omitted). "The constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided." *Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981). Generally, "counsel must *** prepare himself on the law to the extent appropriate to the nature and complexity of the case ***." *Id.*

With good reason, in light of *Sanchez-Cruz*, petitioner does not contend that his appellate counsel was constitutionally inadequate for failing to assert an OEC 403 argument in the opening brief to this court. Instead, petitioner contends that his counsel was deficient for failing to raise the OEC 403 argument at either of two points: (1) after the Oregon Supreme Court accepted review in *Southard* but before petitioner's appeal was decided in this court, or (2) after the *Southard* decision issued but before the entry of the appellate judgment in petitioner's case.

---

[3] At the post-conviction hearing, the court stated, "[T]he appellate attorney properly raised the issues of the diagnosis of sexual abuse." Petitioner asserts that that statement represents an erroneous conclusion by the post-conviction court that appellate counsel raised the OEC 403 issue in petitioner's direct appeal. It is not clear to us, from that statement and the context in which it was made, whether that statement was indeed a conclusion to that effect. Despite having argued differently before the post-conviction court, defendant now concedes that appellate counsel did not raise the OEC 403 issue. We agree; whatever conclusion the post-conviction court intended by that statement, our review of the record reveals that, as a matter of law, appellate counsel did not raise the OEC 403 issue before this court in his direct appeal.

In assessing petitioner's claims, it is necessary to first resolve whether petitioner's trial counsel adequately preserved an argument under OEC 403 such that it could subsequently be raised in this court on appeal. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error of law apparent on the record."). That is because, "except in extraordinary circumstances, appellate counsel's failure to raise unpreserved matters does not, and cannot, constitute inadequate assistance." *Pratt v. Armenakis*, 199 Or App 448, 467, 112 P3d 371, *adh'd to on recons*, 201 Or App 217, 118 P3d 821 (2005), *rev den*, 340 Or 483 (2006) (footnote omitted).

OEC 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." At trial, petitioner's counsel objected to Oddo's testimony outside the presence of the jury. It is necessary to quote that objection at some length:

"Your Honor, this is a touching case. In other words, it's not the kind of case that one would expect to find, nor is there an allegation of, any kind of physical injury, physical evidence, frankly of what happened here. And, of course, one of Dr. Oddo's purposes in examining the alleged victims is to determine whether there has, in fact, been some evidence, physical evidence, of sexual touching. But even taking the State's witnesses in the light most favorable to the State, there shouldn't be any evidence, and there wouldn't be any * * * physical evidence of touching in this case.

"And so, I don't think his testimony would be relevant regarding what examinations he performed, physical examinations. *And then, moreover, what his conclusions were based on those examinations.* At least what he medically concluded he saw, I guess is what I'm trying to say.

"Then we get into this additional issue of Dr. Oddo is basically—in every report he writes, he states an opinion

regarding whether the child was sexually abused. And I have, in the hundreds of reports I've read from Dr. Oddo, he's never once concluded that a child wasn't sexually abused regardless of whether it's a touching case or not. And that, obviously goes to the ultimate issue[,] which is basically can Dr. Oddo express the opinion this child was physically abused?

"And I just want to get [an] advance[] ruling on *** that question. *** I've never had a case in which he's been allowed to testify in a touching case that this child has been sexually abused. Because obviously there's no physical evidence to support his opinion because there's—now what he will say is the absence of physical evidence doesn't rule out the possibility that they were abused. And I would grant that, of course, because there's no way to tell one way or the other just from the physical evidence. It doesn't rule it out, it doesn't rule it in. What my concern is, is that he's gonna get up there, and I know he knows better, but I've had him try to do this before, get up there and say, 'This child was sexually abused based on my examination.' And obviously—first of all, again, I don't think there's a foundation established for that. He's not an expert psychologist. I don't think a psychologist would be able to testify in his or her medical opinion that the child was sexually abused. *And my concern would further be that the jury would be— like accord that some weight unduly if he gets up there and says, 'Yeah, I believe this child and this child was sexually abused.'*

"So I think then *** we get in the issue of *** what precisely is he go[ing] to testify to. *Now he does do interviews with the children, and I guess I would be objecting to the extent that he testifies about the interviews that it's cumulative.* I suppose I could see the State making a case that he could testify to what these girls said, but it is a bit cumulative. I mean, we could probably run a hundred people in here who have, you know, could say this is what she told me, this is what she told me, this is what she told me, this is what she told me, this is what she told me. But at some point, you know, it's got to end. We've already had the child testify, we've already had the interview with the officer, we've had a couple of parents testify. You know, at some point it has to end, in other words. You know, at some point you've got to say look, enough bringing in so many people who are saying what the child testified to.

"But again, I think that's more of a contentious issue. My main concern is with basically what relevance does his physical exams [*sic*] have? In other words, if this were a theft case and I brought a doctor in to say the [D]efendant isn't suffering from any injuries, I don't think he'd be allowed to testify in that kind of situation. And again, the State's theory here, is this is a touching, and obviously there wouldn't be any physical evidence, especially given that the alleged touching in these cases happened at least a couple weeks and in some cases even longer before the incidents. And none of the children have testified that there w[ere] any scars, marks, or anything left like that on their person.

"And so, I guess I'm just worried about limiting his testimony. Because the reason, to be quite frank, they bring Dr. Oddo in just to give some aura of credibility to their case and to their witnesses. And they think, you know—and I can understand why they do it, it's tactically, you know, a good move. *But to bring a doctor in and say, [']we're putting a doctor up here, we're taking this case seriously, therefore you should convict him.[']*

"To the extent that he's allowed to get into his examinations and all that kind of stuff, again I don't think it's relevant, but I'm especially concerned with him testifying to the ultimate issue in this case on each of those victims."

(Emphases added.) The state then volunteered to make an offer of proof to establish what Oddo would testify about. After the trial court indicated that it would overrule his objection, defense counsel stated:

"Well just so I can make a record here, * * * he is a pediatrician and he does have experience in interviewing, but he's not a psychiatrist, he's not a psychologist. And just for the same reason that the detective, who has also received training in interviewing techniques, would not be allowed to get up there and say, 'This child was sexually abused,' there's really nothing to distinguish Dr. Oddo's training, he may have more of it, but it's not qualitatively different than what the detective's training is with regard to interviewing techniques of alleged sexual abuse victims.

"And again, I'm really concerned, your honor, that if he gets up there and is able to say, '[I]n my opinion she was sexually abused,' *that's gonna carry so much weight with*

*the jury when he's not, again, qualified at least to render that ultimate opinion on that question. And again, we're not talking about a psychologist, we're not talking about a psychiatrist, he's an M.D., a pediatrician. And when there is no physical evidence to say one way or the other what happened here, I think then we get beyond his realm of expertise.* And I have no problem with him testifying that, you know, 'I interviewed these children and this is what they told me,' okay? *I think it's cumulative.*"

(Emphases added.) After the state's offer of proof, the court overruled petitioner's objection, stating, "I think the jury makes the ultimate decision even if whatever Dr. Oddo's opinion is, the jury has the right not to accept that."

To sufficiently preserve an argument "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). "[I]t is essential to raise the relevant issue at trial, but less important to make a specific argument or identify a specific legal source with respect to the issue raised." *State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998). "[I]n considering whether an objection at trial raises the 'issue' being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the [preservation] requirement." *Id.*

Defendant's trial counsel adequately preserved the OEC 403 argument such that appellate counsel could have properly raised it before this court in his direct appeal. Although trial counsel's objection was lengthy and wide-ranging, the language we have emphasized above was sufficient to alert the trial court and the state to the nature of defendant's objection. Trial counsel explicitly stated his concern that, because there was no physical evidence of abuse, the jury would give improper weight to Oddo's testimony by reason of his title; he also argued that the evidence was not "relevant," and was "cumulative." In short, trial counsel argued that the evidence was minimally probative, that it unfairly prejudiced defendant, and that it should therefore

not be admitted. That is the rule of evidence that OEC 403 embodies. Moreover, the trial court apparently took that to be the basis of defendant's objection, stating that the "jury has the right not to accept" Oddo's opinion; we understand that to mean that the trial court considered the jury both capable of weighing the evidence for its legitimate evidentiary value and unlikely to be unduly influenced to decide the case on improper grounds.

Because the OEC 403 issue was properly preserved— and appellate counsel, in the exercise of "reasonable professional skill and judgment," would have recognized that it was—we turn to whether appellate counsel reasonably could have concluded that the OEC 403 issue was not worth raising on appeal. As noted, the first point at which appellate counsel may have been deficient for failing to raise the issue is between the time that the Supreme Court accepted review in *Southard* but before we issued a decision in petitioner's appeal. At the time that the court accepted review of *Southard*, it issued a media release, which explained:

"On review, the issues are:

"(1)   Whether a medical diagnosis of child sexual abuse based on the child's claim of abuse and his behavior, without confirming physical evidence, is scientifically valid under the requirements of *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).

"(2)   Whether a medical diagnosis of child sexual abuse in the absence of corroborating physical evidence is unfairly prejudicial.

"(3)   Whether a diagnosis of child sexual abuse that is based on the evaluator's detailed explanation as to why the child's statement is truthful is an impermissible comment on the credibility of the alleged victim."[4]

---

[4] The media release stated that it was provided for the benefit of the media, and that practitioners "should not rely on the summaries, or the statement of issues to be decided in the summaries as indicating the questions that the Supreme Court will consider." Nonetheless, the quoted material sufficiently captures the issues that the defendant in *Southard* had raised in this court, and thus, the issues that were properly before the Supreme Court. *See* ORAP 9.20(2) ("If the Supreme Court allows a petition for review, the court may limit the questions on review. If review is not so limited, the questions before the Supreme

We reject petitioner's argument that his appellate counsel's failure to raise the OEC 403 argument after the Supreme Court accepted review in *Southard* rendered his counsel's performance constitutionally inadequate. We do so both because of the state of the law regarding the issue that appellate counsel *did* raise—inadmissible vouching—and the state of the law regarding the issue that counsel *did not* raise—OEC 403. *See Krieg*, 221 Or App at 40 ("[W]hether petitioner's *** appellate counsel exercised reasonable professional skill and judgment *** entails an examination of the state of the law at the relevant times.").

Petitioner asserts that the inadmissible vouching argument that his appellate counsel raised was almost certain to fail in this court because of our decision in *State v. Wilson*, 121 Or App 460, 855 P2d 657, *rev den*, 318 Or 61 (1993). There, a doctor conducted an interview and a medical examination of a child; the examination revealed no physical evidence of abuse. The doctor diagnosed sexual abuse; the defendant moved to prohibit the admission of that diagnosis on the grounds that "any comment on an alleged diagnosis *** would be a direct comment with regards to the credibility of the [child]." *Id.* at 462 (internal quotation marks omitted; omission in original). The trial court denied the motion; the defendant appealed, contending that the doctor's diagnosis should have been excluded "because the jury could have inferred from that diagnosis that [the doctor] believed the child's statements." *Id.* at 465. We affirmed, stating:

> "[The doctor] testified that, on the basis of her evaluation of the child's interview, physical examination and history, she diagnosed the child as having been sexually abused. Although, if believed, [the doctor's] testimony supported the child's testimony, that does not render it a *direct* comment on the child's credibility. It was an opinion as to the proper medical diagnosis. A medical doctor is not precluded from testifying as to her medical diagnosis simply because the jury may infer from that testimony that another witness is or is not telling the truth."

*Id.* (emphasis in original).

---

Court include all questions properly before the Court of Appeals that the petition or the response claims were erroneously decided by that court.").

Although there is no doubt that an impermissible vouching argument would have looked unpromising in light of *Wilson*, the law was not so contrary to appellate counsel's argument as petitioner suggests. We recently explained as much in *Logan v. State of Oregon*, 259 Or App 319, 328, 313 P3d 1128 (2013), *rev pending* (2014), where we noted that, as of the time of the petitioner's appeal, the Supreme Court "had repeatedly made it clear that, 'in Oregon, a witness, expert or otherwise, may not give an opinion on whether he believes another witness is telling the truth.'" *Id.* (quoting *State v. Keller*, 315 Or 273, 284, 844 P2d 195 (1993)) (brackets omitted). We also noted the then-existing distinction "between inadmissible vouching as to the credibility of a witness and admissible evidence that merely tends to bolster the credibility of a witness." *Id.* at 328. That distinction had been developed over several cases, including *Middleton*, 294 Or at 438, *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), *Keller*, 315 Or at 284, and *Wilson*, 121 Or App at 465. *Keller* is particularly instructive. There, a doctor testified as an expert in the field of sexual abuse after diagnosing sexual abuse in a young child. In explaining to the jury why she reached that diagnosis, the doctor stated that "'there was no evidence of leading or coaching or fantasizing'" during the child's interview and that the child was "'obviously telling you about what happened to her body.'" 315 Or at 285 (brackets omitted). The Supreme Court concluded that "those statements amount[ed] to testimony that the child was credible" and were therefore inadmissible. *Id.* Thus, whatever *Wilson* stated about the matter, at the time that petitioner's appeal was pending, the Supreme Court had held that a doctor's testimony that a child had been sexually abused could, in certain circumstances, constitute inadmissible vouching.

In *Logan*, we explained the distinction that existed between *Wilson* and *Keller*, which we restate using terms that are applicable here: "[T]he dispositive question at the time of petitioner's criminal trial was whether [Oddo's] testimony about the [diagnosis of sexual abuse] was directed, either expressly or implicitly, at the credibility of [the child witnesses] or whether it simply allowed an inference in support of [the children]." 259 Or App at 331. Presumably with

that understanding in mind, petitioner's appellate counsel cited—by way of a quote from *State v. Leahy*, 190 Or App 147, 152-53, 78 P3d 132 (2003)—*Middleton, Milbradt,* and *Keller* in his opening brief to this court, stating: "'In fact, expert testimony that is even "tantamount" to saying that a particular witness is telling the truth is inadmissible'" (quoting *Leahy*, 190 Or App 152-53). The brief went on to argue:

> "Dr. Oddo's testimony established that he had formed his expert opinions and medical diagnoses that S, C, and T, were sexually abused solely on the victims' statements that defendant had touched their breasts at the clinic. His opinions were nothing more than statements that he believed that those victims were telling the truth, which were impermissible comments on the credibility of witnesses."

Petitioner's appellate counsel also cited *Keller* directly. After setting out the Supreme Court's holding in that case, the brief stated that "[t]he situation here is no different."

In light of *Keller*, that was a reasonable argument to make, especially given Oddo's testimony that his diagnoses were based entirely upon what the children had told him. Oddo stated that he had experience with children fabricating evidence of sexual abuse, implying that he was capable of perceiving such fabrication. Further, Oddo implied that, in cases of children who had been "coached," he had been able to uncover made-up allegations because the stories were not plausible and the details either changed or were not specific enough. He also stated that, when children presented him with specific details, when it was "obvious" that the described event had an "emotional[]" impact on them, and when the children were embarrassed to talk about an incident, "those are all signs that it's truthful." He also implied that preteen children, such as the ones that defendant was accused of abusing, generally lacked the motive to fabricate abuse that sometimes existed in teenagers. The import of all that testimony was clear: Oddo thought the children were being truthful because they did not exhibit signs of having been coached, they were not of an age or in a circumstance where he believed that they had an incentive to lie, and they exhibited what he considered to be signs of truthfulness. Whichever side of the line drawn by *Keller*

and *Wilson* that petitioner's vouching argument fell on, it was not unreasonable, even after the Supreme Court had granted review in *Southard*, for appellate counsel to argue that petitioner's judgment of conviction should be reversed under *Keller*. The relevance of that argument's merit is in the fact that appellate counsel may have more reasonably declined to raise a speculative OEC 403 argument when he had already presented this court with a viable, albeit not particularly compelling, argument under the law as it then stood.[5]

Turning now to the argument that petitioner asserts should have been made, it must first be noted that, although the Supreme Court had indicated that the OEC 403 issue *might* be considered in *Southard*, there was nothing to particularly indicate that the court was going to decide the case on that issue, let alone decide it in a manner favorable to petitioner. Indeed, *Southard* represented a substantial departure from previous law. *See Umberger v. Czerniak*, 232 Or App 563, 564-65, 222 P3d 751 (2009), *rev den*, 348 Or 13 (2010) (stating that *Wilson* "exemplified" the "rule regarding expert testimony as to a diagnosis of child sexual abuse," citing *Sanchez-Cruz* for the proposition that a diagnosis of sexual abuse was then-considered admissible evidence, and stating that "[o]nly recently, in [*Southard*] did the Oregon Supreme Court hold differently").

In assessing the performance of appellate counsel, the potential benefits of raising the OEC 403 issue after the Supreme Court accepted review in *Southard* may seem

---

[5] Petitioner's original appellate brief made no attempt to distinguish *Wilson*, whereas the state argued that *Wilson* squarely controlled the issues in petitioner's appeal. At all events, however, petitioner does not allege that appellate counsel was inadequate for failing to more vigorously or diligently develop the impermissible vouching argument.

Moreover, before oral arguments in petitioner's appeal, the Supreme Court had accepted review in *State v. Lupoli*, 348 Or 346, 234 P3d 117 (2010), another case involving an expert's diagnoses of sexual abuse in young children. The only issue in that case, as relevant to this discussion, was whether those diagnoses constituted improper vouching. That is, at the time that petitioner's case was submitted to this court, and at the time that the Supreme Court held petitioner's petition for review in abeyance, the Supreme Court had accepted review of two sexual-abuse cases in which impermissible vouching was at issue, and only one case where OEC 403 was at issue. Approximately two months after petitioner's appellate judgment issued, the vouching argument advanced in *Lupoli* prevailed.

large; however, those potential benefits appear vastly more speculative without the assistance of hindsight. In considering whether to raise an OEC 403 argument in this court after the Supreme Court took review in *Southard*, the following facts confronted appellate counsel. First, counsel would have had to seek the permission of this court to raise the issue. *See* ORAP 5.45(1); *State v. Jones*, 184 Or App 57, 60 n 2, 55 P3d 495 (2002) (declining to consider an issue not raised in an opening brief); *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 237 n 20, 12 P3d 507 (2000) (declining to consider an issue not raised in opening brief that was asserted for the first time on reply).

Assuming, then, that appellate counsel could have reasonably expected us to exercise our discretion to allow petitioner to present an OEC 403 argument, there was nothing, in light of *Sanchez-Cruz*, to reasonably indicate to counsel that the outcome of the appeal in this court would be any different than what it eventually was. As we have stated in the context of ineffective assistance of trial counsel, the constitution does not require appellate counsel to be "clairvoyant." *Umberger*, 232 Or App at 565. Petitioner points us to no authority for the proposition that appellate counsel is ineffective for failing to anticipate a change in the law when there is controlling, contrary precedent during the entire pendency of the appeal. As we said in *Turner v. Maass*, 103 Or App 109, 110 n 3, 795 P2d 617, *rev den*, 310 Or 547 (1990) (some citations omitted):

> "It is pure hindsight to suggest that because, subsequent to petitioner's direct appeal, the Supreme Court impliedly overruled *State v. Bennett* in *State v. Lyon*, appellate counsel should have known that it would do so. What we must look at in evaluating the first prong of the test stated in *Guinn v. Cupp* [304 Or 488, 747 P2d 984 (1987)] is what was the state of the law at the time the appeal was pending. Without a more substantial disavowal of the underpinnings of [a prior case] competent appellate counsel could properly rely on the opinion of the Court of Appeals."

Although it is tempting, in reviewing the outcome in *Southard*, to say that competent counsel would have raised the argument that was eventually deemed meritorious by the Supreme Court, we must make every attempt to not

analyze counsel's performance with the benefit of hindsight. *Burdge*, 338 Or at 492.

As such, appellate counsel may have reasonably perceived that the only direct benefit that would obtain by asserting an OEC 403 argument in this court would be the chance to raise that argument in petitioning the Supreme Court for review of our decision. Any prospective value in that chance, however, was entirely contingent on the Supreme Court not just reaching the OEC 403 issue in *Southard*,[6] but deciding the case on that ground and in a manner favorable—and applicable—to petitioner's claim. Without the benefit of hindsight—and perhaps even with it—it was not at all obvious from appellate counsel's position at the time that the stars would align so propitiously. *See Southard*, 347 Or at 142 ("Our holding today is narrow."); *State v. Pekarek*, 249 Or App 400, 402 n 1, 277 P3d 594 (2012) (Edmonds, S. J., dissenting) ("In *Southard*, the court was careful to point out that its holding was confined to the circumstances of that case ***.").

In sum, appellate counsel may have reasonably decided, given the circumstances that we have discussed above, that raising OEC 403 after the Supreme Court granted review in *Southard* was not worth the candle.[7]

---

[6] Reasonable appellate counsel could have easily concluded—from reading the briefing that was submitted to the Supreme Court in *Southard*—that the OEC 403 issue would not be central to the eventual resolution of that case. As noted, aside from the vouching issue, the precise question in *Southard* was whether a doctor's diagnosis of sexual abuse was admissible as scientific evidence. Resolution of that question, in turn, required analysis of three criteria, *viz.*, relevance under OEC 401, scientific validity under OEC 702, and the balancing of OEC 403. That is, the OEC 403 component of the case was a smaller part of the larger issue of whether the diagnosis was admissible as scientific evidence. The *Southard* appellant's opening brief in the Supreme Court focused almost exclusively on the OEC 702 issue, devoting approximately 24 pages to that argument and three pages to the OEC 403 argument.

[7] Although we acknowledge that the risks in attempting to raise the OEC 403 issue in this court were, perhaps, marginal, we hesitate to hold that counsel was constitutionally required to raise an argument when the benefits of doing so offered, at all times during the pendency of his appeal in this court, a minimal chance of success. In the words of Justice Jackson:

"One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases.

Petitioner has not carried his burden of putting forth "facts demonstrating that counsel failed to exercise reasonable professional skill and judgment" in failing to raise an OEC 403 argument while petitioner's appeal was pending in this court. *Holloway*, 225 Or App at 180.

The dissent would hold, as a constitutional matter, that petitioner's appellate counsel provided deficient representation for failing to raise an OEC 403 argument in this court before the state submitted its answering brief. The dissent thus advances the proposition that, in order to be constitutionally adequate, appellate counsel must, after filing an opening brief, not only keep apprised of which issues become pending in the Supreme Court, but assert each of those issues that might conceivably, one day, be resolved in a manner that holds out some prospect for the client's success. Moreover, appellate counsel would be required to assert those issues not because doing so would—in the view of counsel's professional judgment—improve a client's chances of success on the merits under existing law, but instead because counsel must position the client to take advantage of subsequent favorable changes in the law that may potentially occur, regardless of what counsel's professional judgment might reasonably indicate about the likelihood that such changes will be forthcoming. *See* 261 Or App 783 n 6 (describing the focus of the briefing in *Southard*). The Oregon Constitution does not require appellate counsel to advance every conceivable argument in a given appeal on the off-chance that one of them will eventually prove effective.

There remains the issue of whether appellate counsel was constitutionally inadequate for failing to raise the OEC 403 issue after the decision in *Southard* was issued and while the Supreme Court was holding his petition for

Multiplicity hints at lack of confidence in any one * * *. [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."

Robert H. Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L Q 115, 119 (1951); *see also Smith v. Murray*, 477 US 527, 536, 106 S Ct 2661, 91 L Ed 2d 434 (1986) ("Th[e] process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." (Internal quotation marks omitted.)).

review in abeyance. On this point, we conclude that the prejudice prong of the analysis is dispositive. Even assuming—without deciding—that appellate counsel's failure to attempt to present this court with an OEC 403 argument after *Southard* issued constituted a failure to "exercise reasonable professional skill and judgment," petitioner assumes the following sequence of events: (1) we affirm petitioner's judgment of conviction; (2) the Supreme Court holds petitioner's petition for review in abeyance; (3) *Southard* is decided; (4) petitioner's appellate counsel attempts to raise, in this court, for the first time, the OEC 403 issue as a matter of plain error; (5) we exercise our discretion to allow petitioner to present that argument; and (6) we exercise our discretion to reverse petitioner's judgment of conviction as plain error in light of *Southard*.

Again, it is petitioner's burden to show that it is more likely than not that he was prejudiced by counsel's deficiencies, that is, that the outcome of his appeal would have been different if appellate counsel had asserted the OEC 403 argument. Petitioner cites no authority for his argument that this court would have allowed him, as a matter of discretion, to raise the OEC 403 issue after *Southard* was decided. At that point, we had affirmed petitioner's conviction, his appeal from that decision was being held in abeyance by the Supreme Court, and the period during which he could petition this court for reconsideration had expired.[8] We cannot say that it is more likely than not that we would have exercised our discretion to allow petitioner to present that argument, let alone that we would have then exercised it a second time to reverse petitioner's convictions based on OEC 403 as a matter of plain error. Petitioner has not met his burden of showing that he was prejudiced by his attorney's failure to raise the OEC 403 issue after *Southard* was decided.

We reach similar conclusions with respect to petitioner's Sixth Amendment arguments. For the reasons discussed above, we conclude that appellate counsel's failure

---

[8] ORAP 6.25(2) provides, "A petition for reconsideration shall be filed within 14 days after the decision." *Southard* was decided approximately six months after we decided petitioner's appeal.

to raise the OEC 403 issue in this court during his appeal did not fall below an objective standard of reasonableness. Additionally, petitioner has not demonstrated that appellate counsel's failure to raise the issue while his petition for review was being held in abeyance after the decision in *Southard* created a "'reasonable probability that *** the result of the proceeding would have been different.'" *Holloway*, 225 Or App at 180 (quoting *Strickland*, 466 US at 688).

Affirmed.

**NAKAMOTO, J.,** dissenting.

In this post-conviction relief case, the majority concludes that petitioner's appellate lawyer for his direct appeal was constitutionally adequate. Yet, his lawyer failed to assert a ground for a new trial that was preserved in the trial court and that was the subject of Supreme Court review in a significant case during the briefing in petitioner's direct appeal in this court. *See State v. Southard*, 344 Or 401, 182 P3d 200 (2008) (allowing review April 16, 2008). Had his lawyer done so and covered all the bases, petitioner would have received a new trial pursuant to the Supreme Court's holding in *State v. Southard*, 347 Or 127, 140-42, 218 P3d 104 (2009) (under OEC 403, admission of a physician's medical diagnosis of child sexual abuse is reversible error in the absence of any physical evidence of abuse). Because petitioner proved that his appellate lawyer could and should have preserved his argument and that he suffered prejudice, I would reverse the post-conviction court's judgment denying relief.

To recap the trial court proceedings briefly, petitioner, a receptionist at a free health clinic on the grounds of an elementary school, was charged with six counts of sexual abuse in the first degree, ORS 163.427, one count of sodomy in the first degree, ORS 163.405, and one count of sodomy in the second degree, ORS 163.395. The trial court dismissed one count of sexual abuse and the two sodomy counts. Petitioner was tried on the remaining counts of sexual abuse in the first degree, in which he was accused of fondling the breasts of five girls who attended the clinic.

During trial, petitioner's trial counsel moved to exclude testimony from the pediatrician who had examined the girls, arguing that the pediatrician's examination and opinions were not relevant in the absence of physical findings, or were cumulative; the pediatrician's opinion as to whether the girls were sexually abused would give an "aura of credibility" to the state's case and "carry so much weight with the jury" because that opinion would be qualitatively like that of a trained detective; the pediatrician would be testifying as to ultimate issues in the case reserved for the jury; the pediatrician was not qualified to offer an opinion that the children had been sexually abused, in the absence of physical findings; and the pediatrician's testimony was an impermissible comment on the credibility of the state's witnesses. The trial court denied the motion after hearing the pediatrician's testimony in the state's offer of proof. The jury acquitted petitioner of one count but found him guilty of the other counts. Thus, petitioner was convicted of four counts of first-degree sexual abuse, sentenced to serve 150 months in prison and 10 years of post-prison supervision, and ordered to pay restitution.

Petitioner appealed the judgment, and his appellate lawyer filed the opening brief on April 4, 2008, raising four assignments of error on behalf of petitioner. One assignment challenged the trial court's refusal to give petitioner's requested instruction that the jury must reach a unanimous verdict. In the other three, petitioner asserted that the trial court had erred by denying his motion to exclude the pediatrician's testimony as to his sexual abuse diagnosis for three of the girls.

For the assignments concerning evidentiary error, petitioner's appellate lawyer prepared a combined argument that the pediatrician's testimony about the sexual abuse diagnosis of the three girls was an impermissible comment on their credibility. Although petitioner's appellate lawyer cited a case in support of that argument in which a federal trial court had held that admission of a physician's diagnosis of sexual abuse would not meet Federal Rule of Evidence 403's balancing test between probative value and unfair prejudice, *United States v. Funds Held in the Name or for*

*Wetterer*, 991 F Supp 112, 120-21 (EDNY 1998), petitioner's appellate lawyer did not make an argument that a medical diagnosis of child sexual abuse in the absence of corroborating physical evidence is unfairly prejudicial under OEC 403.

Of the three issues on review in *Southard*, that one turned out to be the winning issue. As the majority notes, the Supreme Court announced in a media release that the three issues on review in *Southard* were scientific validity, unfair prejudice, and improper comment on a witness's credibility, specifically:

> "(1)   Whether a medical diagnosis of child sexual abuse based on the child's claim of abuse and his behavior, without confirming physical evidence, is scientifically valid under the requirements of *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).

> "(2)   Whether a medical diagnosis of child sexual abuse in the absence of corroborating physical evidence is unfairly prejudicial.

> "(3)   Whether a diagnosis of child sexual abuse that is based on the evaluator's detailed explanation as to why the child's statement is truthful is an impermissible comment on the credibility of the alleged victim."

*See* 261 Or App at 777. The majority also observes that the media release adequately described the issues that the defendant had raised on review in *Southard*. *Id.* at 777-78 n 4.[1]

Simply stated, the crux of this case is whether petitioner's appellate lawyer could have and should have timely protected his client's position that the trial court committed reversible evidentiary error by relying on all preserved grounds that were accepted for review in *Southard*. *See Guinn v. Cupp*, 304 Or 488, 494-95, 747 P2d 984 (1987) (in a case involving ineffective assistance of appellate counsel, stating the issues as whether a claim could and should have been raised on the first appeal, and with what result).

---

[1] The *Southard* petition for review had been filed by another appellate lawyer in the Appellate Division of the Office of Public Defense Services, the office of petitioner's appellate lawyer.

I conclude that petitioner's appellate lawyer both could have and should have protected his client's position in that manner.

The issue of whether petitioner's appellate lawyer could have timely protected his client's position on appeal is largely answered in the affirmative by the majority opinion. Although trial counsel does not appear to have preserved the first issue on review in *Southard*, namely, the scientific validity of a child sexual abuse medical diagnosis, I agree with the majority's conclusion that trial counsel adequately preserved an objection to the pediatrician's child sexual abuse diagnoses under OEC 403. 261 Or App at 776-77 ("In short, trial counsel argued that the evidence was minimally probative, that it unfairly prejudiced defendant, and that it should therefore not be admitted."). The majority then assumes for purposes of the analysis that petitioner's appellate lawyer could have added the OEC 403 issue to petitioner's briefing in time to protect his client's position on appeal, in light of the Supreme Court's media release of the issues on review in *Southard* approximately one week after petitioner's opening brief was filed. *See* 261 Or App at 781-82 (noting that the appellate lawyer could have sought leave of this court to file another brief to present the OEC 403 argument).

I do not doubt the assumption that we would have allowed a motion by petitioner for leave to file a supplemental brief in light of the issues on review in *Southard*. The evidentiary error was a key aspect of petitioner's appeal, and the state's briefing period was hardly underway. In fact, the state filed its answering brief in the appeal more than six months later, in late October 2008. Thus, I conclude that petitioner could have filed an appellate brief raising the argument that the trial court had erred under OEC 403 when it allowed the pediatrician to testify to sexual abuse diagnoses absent any physical evidence, because the minimal probative value of the evidence was outweighed by the danger of unfair prejudice.

Taking the next step, I conclude that petitioner's appellate lawyer also should have raised the OEC 403 argument. On that point, as the majority notes, a petitioner seeking relief under Article I, section 11, of the Oregon

Constitution must establish that his lawyer failed to exercise reasonable professional skill and judgment, *Gable v. State of Oregon*, 353 Or 750, 758, 305 P3d 85, *cert den*, ___US ___, 134 S Ct 651 (2013), and in seeking relief under the Sixth Amendment to the United States Constitution, the petitioner must show that the lawyer's performance fell below an "objective standard of reasonableness" under "prevailing professional norms." *Strickland v. Washington*, 466 US 668, 688, 104 S Ct 2052, 80 L Ed 2d 674 (1984). "For a claim for ineffective assistance of appellate counsel, a petitioner must show that competent appellate counsel would have raised that claimed error." *Monahan v. Belleque*, 234 Or App 93, 97-98, 227 P3d 777, *rev den*, 348 Or 669 (2010) (emphasis omitted). We evaluate the lawyer's performance "from the lawyer's perspective at the time." *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002).

In this case, the likelihood of petitioner prevailing in this court on the arguments that petitioner's appellate lawyer had to work with were dim. As petitioner and the majority observe, 261 Or App at 778, the argument that petitioner's appellate lawyer did focus on—impermissible comment on the credibility of witnesses—was "almost certain to fail in this court" because of *State v. Wilson*, 121 Or App 460, 465, 855 P2d 657, *rev den*, 318 Or 61 (1993) (rejecting that argument). The argument that petitioner's appellate lawyer failed to raise—testimony that a witness was diagnosed with child sexual abuse, in the absence of physical evidence of abuse, is inadmissible under OEC 403—had also been rejected by this court in *State v. Sanchez-Cruz*, 177 Or App 332, 346, 33 P3d 1037 (2001), *rev den*, 333 Or 463 (2002), as the majority explains. 261 Or App at 768-70. The majority emphasizes that "there was nothing, in light of *Sanchez-Cruz*, to reasonably indicate to counsel that the outcome of the appeal *in this court* would be any different than what it eventually was." 261 Or App at 782 (emphasis added). I agree.

Thus, paying attention to the issues on review in the Supreme Court in *Southard* and pursuing petitioner's preserved arguments like those to be heard in *Southard*, a case with exactly the same trial court ruling being appealed

in petitioner's case, was a promising avenue, if not *the* avenue, for petitioner to gain a new trial. However, there is no evidence from petitioner's appellate counsel that he made a tactical decision to refrain from adding the OEC 403 issue to petitioner's opening brief.

The majority rationalizes the failure of petitioner's appellate lawyer to make the OEC 403 argument on several grounds, but none, in my view, are persuasive. The majority notes that, despite *Wilson*, there were Supreme Court cases that lent some weight to petitioner's argument on direct appeal that a child sexual abuse diagnosis constituted an impermissible comment on a witness's credibility, or vouching. *See* 261 Or App at 779-81. The majority, however, fails to recognize that the same could be said about the OEC 403 argument that petitioner's appellate lawyer failed to make on behalf of petitioner in his direct appeal.

For example, in *State v. Brown*, 297 Or 404, 438-42, 687 P2d 751 (1984), which we discussed in *Sanchez-Cruz*, 177 Or App at 345-46, the Supreme Court concluded that polygraph evidence was scientific evidence and that it might possess probative value, but the court also considered whether OEC 403 required exclusion of the polygraph evidence in that case. The Supreme Court affirmed the trial court's exclusion of the evidence given, among other factors, that OEC 403 requires courts "to evaluate the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence" and polygraph evidence was the type of evidence on which a jury would likely place undue weight. *Id.* at 439-40. Thus, it was also possible, based on existing Supreme Court precedent, to make an argument under OEC 403 in petitioner's direct appeal in case the Supreme Court ruled on OEC 403 grounds in *Southard*.[2]

The majority also reasons that to hold that petitioner's appellate lawyer should have raised the OEC 403 issue in the direct appeal would require the lawyer to be "clairvoyant" and to anticipate the stars aligning for a positive outcome in *Southard*. 261 Or App at 782-83. That

---

[2] We now know, of course, that the Supreme Court in *Southard* relied on *Brown* in its analysis of the OEC 403 issue. *Southard*, 347 Or at 139-40.

rationale, though, misses the key aspect of this case: preservation in light of the issues under review in *Southard*. Petitioner's appellate lawyer was not going to gain a new trial for petitioner in this court under our precedents and so had to be looking to a favorable Supreme Court decision in *Southard* for relief for his client. And, if petitioner was to have any chance to take advantage of a favorable ruling in *Southard*, his appellate lawyer had to raise those arguments in this court. That the final outcome in *Southard* was going to be many months further down the litigation path in the Supreme Court, and was unknown, does not change the fact that petitioner's appellate lawyer had the opportunity to preserve two of the three issues on review in *Southard* but, instead, preserved only one.

Our decision in *Turner v. Maass*, 103 Or App 109, 795 P2d 617, *rev den*, 310 Or 547 (1990), on which the majority relies, 261 Or App at 782, is not to the contrary. In that case, the petitioner, Turner, sought and was denied post-conviction relief by arguing that in *State v. Lyon*, 304 Or 221, 744 P2d 231 (1987), the Supreme Court "subsequent to [the] petitioner's direct appeal," had overruled precedent in this court that was adverse to the petitioner during his direct appeal. *Turner*, 103 Or App at 110 n 3. Although superficially similar, *Turner* is actually far different from the present case. Turner's direct appeal was filed in May 1984; we affirmed without opinion in June 1985. *State v. Turner*, 74 Or App 179, 702 P2d 1174, *rev den*, 300 Or 64 (1985). The petition for review in *Lyon* was not filed until March 18, 1987, approximately two years and 10 months after the commencement of Turner's direct appeal. Appellate counsel in *Turner* would indeed have had to have been prescient to know that there would be a case accepted for review by the Supreme Court on the very issue involved in Turner's appeal almost three years after appellate counsel filed the appeal. In this case, in contrast, the media release describing the issues on review in *Southard*, a case being handled by a colleague of petitioner's appellate counsel, came out only days after petitioner's appellate lawyer filed petitioner's opening brief. No omniscience was needed to understand that the Supreme Court was going to decide the evidence issue presented in petitioner's direct appeal.

The majority also suggests that there was a legitimate tactical reason for petitioner's appellate lawyer not to add the OEC 403 argument to petitioner's brief, namely, winnowing out weaker arguments. 261 Or App at 783-84 n 7. I disagree that that was or could have been a tactical decision. First, there is no evidence that the lawyer engaged in a tactical decision-making process, much less considered the OEC 403 argument to be a distraction or a disadvantage to petitioner's appeal. Second, I can see no downside to including the argument. For example, the briefing did not have to be extensively enlarged to argue for inadmissibility under OEC 403, to the detriment of the arguments that were asserted on appeal. Third, once the issues on review in *Southard* were known, omission of the OEC 403 argument posed a significant risk for petitioner.[3]

One can legitimately argue about how a reasonable lawyer would have perceived the likelihood of the Supreme Court ruling the way it did. For example, the majority suggests that a reasonable lawyer would have concluded that the chance of the Supreme Court ruling that the evidence of a child sexual abuse diagnosis was inadmissible under OEC 403 was low. 261 Or App at 783 n 6. But even a high probability of an adverse Supreme Court ruling on the OEC 403 issue was not the risk to which petitioner's appellate lawyer exposed petitioner. Instead, the risk for petitioner was that he would lose his only realistic chance for a new trial if the OEC 403 argument were successful in *Southard*.

To state it another way, going into his appeal, petitioner held two of the three keys that the defendant in *Southard* contended should unlock the door to a new trial based on the erroneous admission of a child sexual abuse diagnosis. Because the outcome in *Southard* was unknown, it was possible that petitioner could unlock that door with either key he held, yet he lost one of those keys on appeal

---

[3] Defendant notes that the OEC 403 issue "was less clearly preserved at trial" than the vouching issue. Perhaps a more plausible explanation for petitioner's appellate counsel's failure to pursue the argument that the unfair prejudice from admission of the medical diagnosis evidence outweighed its probative value is that he thought it was not well preserved at trial. However, the majority's conclusion, with which I agree, is that the unfair prejudice argument was preserved and that petitioner's appellate counsel should have recognized that and could have asserted the OEC 403 argument. 261 Or App at 776-77.

when his appellate lawyer failed to preserve it. The benefit of pursuing the OEC 403 issue was not, as the majority concludes, speculative; rather, by doing so, petitioner would maximize his chance to gain a new trial. Accordingly, I would hold that petitioner's appellate lawyer did not meet the standard of reasonable professional skill and judgment in petitioner's appeal. *See Laymon v. State*, 280 Kan 430, 444, 122 P3d 326, 335 (2005) (allowing post-conviction relief when appellate counsel for the movant failed to preserve a line of argument under review in the state high court in a case being handled by appellate counsel's colleague; the state of developing law favored preserving that argument and counsel could be charged with knowledge of the status of the law).

There can be no doubt that petitioner suffered prejudice as a result: petitioner never received a new trial. While *Southard* was being litigated in the Supreme Court, in March 2009, this court affirmed petitioner's conviction without opinion. *State v. Mesta*, 227 Or App 289, 205 P3d 890 (2009). Petitioner's appellate lawyer filed a petition for review in May 2009. The Supreme Court held petitioner's case in abeyance pending its forthcoming decision in *Southard*. The court issued the *Southard* decision in October 2009. The Supreme Court then denied review in petitioner's appeal approximately three months later, and the appellate judgment issued on March 25, 2010. *State v. Mesta*, 347 Or 533, 225 P3d 43 (2010). One can reasonably infer that the denial was because the issue had not been raised before this court. Later, petitioner's appellate lawyer filed a motion to recall the appellate judgment, after this court had issued two decisions in which we held that a trial court had committed "plain error" under *Southard* by admitting a doctor's diagnosis of sexual abuse in the absence of physical evidence. *State v. Merrimon*, 234 Or App 515, 521-22, 228 P3d 666 (2010); *State v. Lovern*, 234 Or App 502, 514, 228 P3d 688 (2010). By that time, it was too late for petitioner. We denied his motion, and the Supreme Court denied petitioner's second petition for review. *State v Mesta*, 348 Or 461, 234 P3d 983 (2010).

Because petitioner met his burden to establish the elements of a claim of inadequate assistance of counsel, I would reverse the judgment of the post-conviction court. I respectfully dissent.